L. I. STAINBACK ET AL., CLAIMANTS OF THE SHIP WASHINGTON, HER TACKLE, &C., APPELLANTS, v. WILLIAM A. RAE, IN HIS OWN RIGHT, AND AS ADMINISTRATOR OF JOSEPH PORTER WHEELER, DECEASED, AND EDMUND CROSBY, MASTER, OWNERS OF THE SHIP MARY FRANCES, AND FREDERICK TUDOR, OWNERS OF THE CARGO OF SAID SHIP, APPELLEES.

Where a collision takes place between two vessels at sea, which is the result of inevitable accident, without the negligence or fault of either party, each vessel must bear its own loss.

*Mr. Justice Curtis* did not sit in this cause, having been of counsel in the court below.

Stainback et al. *v.* Rae et al.

THIS was an appeal from the Circuit Court of the United States for the District of Massachusetts, in admiralty.

The facts are stated in the opinion of the court.

It was argued by *Mr. Badger* and *Mr. Lawrence*, for the appellants, and by *Mr. Goodrich*, for the appellees.

The points made by the counsel for the appellants, were the following:

*First.* That the watch on board the Washington, was usual, proper, and safe; and that consequently, no negligence is imputable to her.

*Second.* That in the state of the weather, and the position of the two vessels in respect to each other, it was impossible that the Washington could have discovered the Mary Frances at a greater distance than a quarter of a mile, and highly improbable that she could have discovered her at more than half that distance; and that under such circumstances, considering the admitted rate at which the two vessels were approaching each other, it was impossible for the Washington, by any manœuvre whatever, to have avoided the collision.

*Third.* That if the Mary Frances, as stated by some of her witnesses, discovered the Washington ten minutes, and as stated by others, five minutes, before the collision, the two vessels must have been at a distance of two miles, or at least one, from each other, and it was in her power, by changing her course, to have avoided the collision; and if, as stated by the same witnesses, she perceived that the Washington had not discovered her, it was her duty to have done so, and consequently the collision is attributable to the fault, not of the Washington, but of the Mary Frances.

And hence, that the collision was either a mere misfortune, without fault in either party, or without fault on the part of the Washington, and, in either view, the decree must be reversed.

*Mr. Goodrich*, for the appellees, contended,

1. That on the night of the collision, the weather was fair and starlight overhead, with a hazy horizon, and that the night was not unusually dark.

2. The ships being each closehauled on the wind, neither was materially to windward of the other, and each crew was equally favorably situated to see the other ship, and to hear hailing from the other ship.

And if either ship was to windward of the other, and for this reason less favorably situated in those respects, it was the Mary Frances.

3. That the crew of the Mary Frances had a good look-out

45 *

before, and at the time of the collision, and used all due care to prevent it; and that they actually saw and hailed the Washington in time to prevent the collision; and that the crew of the Washington did no act to avoid the collision, and the collision was attributable to the absence of a good look-out on board the latter ship.

4. The appellees maintain, that the rule of the sea is, that where two vessels, closehauled on the wind, approach each other, and must meet unless the course of one is changed, the vessel having her starboard tacks on board, must keep her course, and the one having her larboard tacks on board, must bear up and give way. The Alexander Wise, 2 Wm. Robinson, Adm. R. 65, 68; The Virgil, Id. 201; The Mary Stewart, Id. 244; The Chester, 3 Haggard, Adm. R. 316; The Ligo, 2 Id. 356, 360; Clapp v. Young, 6 Law Reporter, 111–13; 1 Conkling's Admiralty Practice, 303–6; The Europa, 14 Jurist, 627, (2 Law and Eq. R. 562–4); The Genesee v. Fitzhugh, 12 Howard, 443; Walsh v. Rogers, 13 Id. 283; Pritchard's Admiralty Digest, art. 12, p. 156; 1 Bell's Com. 583.

5. That the appellees having made out a *primâ facie* case of want of skill and care on the part of the crew of the Washington, the burden of proof is on the appellants to show that due care and skill was used. Authorities previously cited. The George, 9 Jurist, 282, 4; Notes of Cases, 161; Pritchard's Admiralty Digest, art. 114, 116, and 117, p. 137, tit. Damage.

6. That appellees are entitled in law to recover compensation for freight and cargo, as well as for the ship of appellants. See 3 Kent's Com. 6 ed. 232, § 8; Story on Bailments, ch. 6, §§ 599, 602, 608, and case of Dundee, note to § 609; 1 Bell's Com. 580.

12. The Washington was in fault, because her officers and crew did not maintain that constant care and vigilance which her position required.

A. The Washington, having her larboard tacks on board, was bound to give way.

B. No officer, and only two men on deck, attending to the navigation of the ship — one, McCoy, was at the wheel, the other, Simmons, a boy, was on the look-out.

C. A large ship, with noisy passengers, nearing the land, under full sail, in a hazy night, should have had at least two men on the look-out.

D. No sufficient look-out before the call to the pumps.

E. The Washington might have avoided the collision.

Mr. Justice NELSON delivered the opinion of the court.

This is an appeal from the Circuit Court of the United States for the District of Massachusetts, in admiralty.

Stainback et al. *v.* Rae et al.

The libel charges, that the ship Mary Frances, laden with ice, was on a voyage from Boston to New Orleans, and that on the 11th December, 1847, at about half-past three o'clock in the morning, while on her starboard tack, in the prosecution of the voyage, she was struck by the ship Washington, nearly midships on her larboard side, breaking in her bulwarks and stanchions, and starting her planks and timbers, so that in a few hours she filled with water, and the master and hands were obliged to abandon her, and she went to the bottom.

The respondents, in their answer, state, that the ship Washington, at the time mentioned in the libel, was upon the high seas between George's Shoals and the south shore of Nantucket Island, at a distance of about sixty miles from land; that the wind was blowing a moderate breeze from the south-south-west, and the Washington, with all her reefs out, with courses free, and main-topgallant sails, jib, and flying-jib, and fore and main-topmast-stay-sails set, was sailing full and by, upon her larboard tack, and steering due west by the compass, and as near the wind as possible; that she had a competent watch on deck, keeping a good look-out, the weather being dark and hazy towards the horizon, especially to the leeward of the ship, but the stars visible above. That while she was thus pursuing her course, at about half-past three o'clock in the morning, the Mary Frances was seen about four points on the lee bow of the Washington, and was then in the act of running up, and did immediately run up into the wind athwart the hawse of the Washington; and, that instantly, on the discovery of the Mary Frances, and of the course she was pursuing, the helm of the Washington was put hard up, and every endeavor made by the hands on deck to put her before the wind, and to avoid a collision.

The facts, as proved on the part of the libellants, are substantially as follows:

That about half-past three o'clock, on the morning of the 11th December, 1847, the hands on board the Mary Frances, while she was standing to the eastward, on her starboard tack, the wind from the south-south-west, closehauled, descried the Washington something less than a quarter of a mile distant, about a point and a half forward of the Mary Frances's larboard beam, some of the hands say, on the larboard bow two or three points. The Washington was standing to the westward when first seen, and orders were immediately given to put the helm hard down, and, at the same time, the hands cried out to those on board the Washington, to keep off. The collision took place, as estimated, from five to seven minutes after the Washington was first discovered. The Mary Frances was struck midships, on the lar-

board side, her bulwarks stove in, and her planks below the white streak on the opposite side were broken, and all her fore-rigging carried away. The ship was abandoned with thirteen feet of water in her hold, being a wreck, and wholly unmanageable. The Washington was not at first seen plainly, as the weather was hazy. The second mate of the Mary Frances, who had charge of the watch, and one of the first to descry the Washington, says the weather was hazy and thick, the sky was overcast, no moon or stars visible. The Mary Frances was about 320 tons burden; the Washington about 500 tons

The evidence, on behalf of the respondents, is substantially as follows:

The Washington was bound from Liverpool to Virginia by the way of New York, and had on board a cargo of salt, and some 170 steerage passengers. She was on her larboard tack, closehauled, the wind about south-south-west. The man at the wheel states, that an order was given from the deck, "put the helm hard up, there is a ship into us;" that the order was obeyed instantly, but the collision immediately followed. Simmons, one of the hands, states, that he was on the weather side of the Washington's windlass on the look-out; that the weather was dark, cloudy, and hazy; that he descried the Mary Frances about a minute and a half or two minutes before the collision; that she was on the lee bow of the Washington, between three and four points; that at first he could not determine her course on account of the thick weather. When he first saw her he sang out to the man at the wheel to put helm hard up. The witness heard a noise or hail about half a minute before he descried the Mary Frances, but could not determine whence it came; supposed it might be from some of the passengers, as they were in the habit of making a noise.

This witness is substantially corroborated by several others on board the Washington. Part of the watch were at the pumps at the time the collision took place.

The testimony on both sides agree, that each vessel was going at the rate of five and a half knots the hour.

The court below decreed in favor of the libellants.

Upon a careful perusal of the evidence in behalf of the libellants and the respondents, it is apparent that there is much less discrepancy and contradiction among the witnesses called by the respective parties, as to the material facts, than are usually found in these collision cases.

All agree as to the state of the weather — thick, hazy and dark; as to the direction of the wind — from the south-south-west; the course of the vessels — the Mary Frances on the starboard tack, standing south-east, and the Washington on the

Stainback et al. *v.* Rae et al.

larboard, standing nearly due west; the rate of speed—five and a half knots the hour. And even as it respects the distance the vessels were from each other when first descried, there is very little, if any difference.

According to the witnesses on board the Mary Frances, the Washington was less than a quarter of a mile distant, when she was first seen. The distance of the former vessel, when first seen by the hands on board the Washington, is not stated directly; but Simmons, the look-out, testifies, she was seen from one and a half to two minutes before the collision, which, regarding the combined speed of the two vessels, must have been at about the same distance. The probability is, that the two vessels were much nearer each other than a quarter of a mile, when first seen. The chief mate of the Mary Frances, who was asleep in his berth at the time, but immediately afterwards on deck, fixes the distance the vessel could be seen in that state of the weather at about two hundred yards; and this corresponds with the opinion expressed by the master of the Washington, where he says the Mary Frances might have been seen at a distance of about four times her length. The answer of the experts is that the distance a vessel could be seen in such weather would be uncertain. The course the two vessels were steering was calculated to increase the difficulty, and embarrass the look-out in descrying the vessel ahead, for, as they were approaching each other by the wind, they presented to the eye the edges of the sails, and not the breadth of them, as in other positions.

There is some apparent discrepancy between the witnesses of the two vessels in respect to their relative position at the time they were first seen. The hands on board the Mary Frances state, when they first descried the Washington, she was two or three points on their larboard bow, one of them states, she was a point and a half forward of their larboard beam.

The hands on board the Washington state that the Mary Frances was on their lee bow when first seen, which would place the Washington to the windward. This may be reconciled probably by what is stated by the experts, who agree, that two vessels, approaching each other as these were, the hands on each would necessarily see the approaching vessel over the lee bow, and which may have led those on board the Washington to suppose this vessel was on the weather side.

The manœuvre of each, on discovering the other, it is agreed, was proper; and, indeed, the only one that could have afforded any chance of preventing the collision. The Mary Frances was thrown into the wind by putting her helm hard down, and

the Washington bore away before the wind by putting her helm hard up. The orders were not only proper and skilful, but were promptly given and instantly executed; and unless fault can be imputed to the latter vessel in not descrying the Mary Frances sooner, so as to have afforded time for these manœuvres to have avoided the disaster, we do not see how she can be properly chargeable with the consequences; and as to that, the difficulty, if not impossibility of discovering a vessel ahead at a greater distance than the Mary Frances was seen by the hands on the Washington, the relative position of the two vessels while approaching each other by the wind, presenting only the edges of the sails instead of their breadth, and in thick and hazy weather, such as existed in this case, in connection with the combined speed of the vessels at the time, seem to furnish evidence sufficient to repel any such imputation. The two vessels must have come together probably in less than two minutes after they were first seen. The look-out appears to have been competent and sufficient, and such is, as we understand it, the opinion of the experts examined, and who were selected by both the parties.

Indeed, the fact that the Mary Frances must have been seen about the same time by the hands of the Washington that she was seen by those on board of the Mary Frances, and which we think is fairly borne out by the evidence, of itself, should be regarded as conclusive against the charge of fault in this respect.

We are of opinion, therefore, that the collision was the result of an inevitable accident, arising out of one of the perils of navigation, and, in judgment of law, is not attributable to the fault of either party. And in such cases the settled rule in admiralty in England is, that each vessel must bear its own loss, which rule has been heretofore recognized by this court, but has not been before directly applied. 2 Dodson's Adm. R. 83; Woodrop Sims, 1 How. Rep. 28; Id. 89; 3 Kent's Com. 231; Abbot on Shipping, Pt. 3, ch. 1, and Pt. 4, ch. 10, § 10; 2 Brown's Civ. & Adm. Law, 204–7; 5 How. Rep. 503, and cases.

The rule is not uniform upon the continent, as several of the maritime states in such cases apportion the loss upon the two vessels. Abbot, 224, 230; 2 Brown's Civ. & Ad. Law, 204–6; 3 Kent's Com. 230, 231, 232.

But we think it more just and equitable, and more consistent with sound principles, that where the loss happens from a collision which is the result of inevitable accident, without the negligence or fault of either party, each should bear his own.

There seems no good reason for charging one of the vessels with a share of a loss resulting from a common calamity be-

yond that happening to herself, when she is without fault, and therefore in no just sense responsible for it.

Our opinion is, that the decree of the court below must be reversed, with costs, and the proceedings remitted, with directions to enter a decree dismissing the libel with costs.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the District of Massachusetts, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed, by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Circuit Court with directions to dismiss the libel with costs.