The **PEOPLES NATURAL GAS COMPANY, Plaintiff,**

v.

**ASHLAND OIL, INC., Defendant.**

**Civ. A. No. 84–120.**

United States District Court,
W.D. Pennsylvania,
Pittsburgh Division.

March 26, 1985.

John R. Kenrick, Patricia L. Dodge, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for plaintiff.

Theodore O. Struk, Larry A. Silverman, Dickie, McCamey & Chilcote, Pittsburgh, Pa., for defendant.

## · OPINION

SIMMONS, District Judge.

This is an admiralty action arising out of a collision between a towboat and a stationary submarine gas pipeline.

The Peoples Natural Gas Company, owner of a natural gas pipeline extending across the Monongahela River, brought this suit for damages against Ashland Oil, Inc., owner and operator of a towboat that struck and ruptured Peoples' pipeline while attempting to dock an oil barge. Peoples contends that this is a case of negligent pilotage. At trial, Peoples proceeded under the theory that the towboat pilot's negligence in the navigation of his vessel was the legal cause of the damage sustained by Peoples' pipeline. The defendant, on the other hand, contends that this is a case of statutory fault. Ashland Oil asserts that Peoples' violation of navigational regulations was the cause in fact of the collision, not the pilot's negligence.

This case was tried to the Court sitting without a jury. After consideration of the applicable rules of law and the evidence adduced at trial, this Court makes the following findings of fact and conclusions of law, followed by an integrated discussion of both.

### I. FINDINGS OF FACT.

1. On January 21, 1981, Captain Eugene H. Dent was piloting the M/V Aetna Louisville, a towboat owned by Ashland Oil, Inc., to spot an oil barge at the Reserve Petroleum Dock along the western shore of the Monongahela River near mile post 40.8.

2. Prior to the late 1950s, the petroleum docking site along the river's shore had been used as a lock channel, with gates at each end for raising or lowering vessels by admitting or releasing water. In the late 1950s, when the United States Corps of Engineers abandoned the lock, it became a docking facility for the American Oil Company. Two concrete walls, which were the

easternmost and center walls of the lock chamber, now form the Reserve Petroleum Dock. A third wall, the westernmost wall of the abandoned lock, is now inland, the area between it and the center wall having been filled with soil.

3. The former lock chamber now used as a petroleum dock is 56 feet wide, but is only accessible from the downstream or northernmost position on the river because a gate sill, 1 foot below the river's surface, impedes access to the dock from the upstream or southernmost position on the river. The sill on the northernmost or downstream position of the river is 10 feet below the river's surface.

4. In the area where the lock's gates were formerly installed, there are gate jamb recesses 3 feet deep and 30 feet long, the edges of which will fracture or puncture an oil barge if it is not properly aligned between the lock chamber walls during the docking procedure. When spotting barges at the dock, a towboat pilot's visibility is impaired by the two lock walls which protrude 20 feet above the surface of the water. Together, these physical conditions pose a hazard for barges accessing the Reserve Petroleum Dock.

5. Proceeding upstream near mile post 40.8 the Monongahela River bends in a sharp easterly direction. The mouth of the lock chamber is situated along the western shore of the river's curve. Because of the river's easterly curvature, the location of the dock on the river's western shore, and the absence of downstream access into the lock chamber, towboats must operate close to the western shore of the river downstream from the lock chamber's entrance to spot barges between the lock walls at the Reserve Petroleum Dock.

6. On September 23, 1949, pursuant to an application made by Peoples, the United States Corps of Engineers issued a Department of Army permit to install a 14 and ¾ inch (outside diameter) metal, non-coated gas pipeline across the Monongahela River between Fallowfield Township, Washington County and the City of Monessen, Westmoreland County. A similar Permit was issued by the Pennsylvania Water and Power Resources Board.

7. Two technical drawings which outlined Peoples' proposed plan for constructing a pipeline across the Monongahela River were incorporated into the Corps' permit. The permit expressly provided that only the work shown on the drawings was authorized, "[a]ny deviations therefrom or additions made without the prior permission of the [Corps was] illegal and subject to an order requiring removal." *See* Department of Army Permit, Joint Trial Exhibit No. 2.

8. The permit's technical drawings specified that the pipeline would be installed at a minimum depth in the channel area of 15 feet below the pool full elevation and 4 feet below the riverbed beyond both United States harbor lines, a distance which spans the entire width of the river.

9. Prior to issuance of the permit, the Corps gave notice to navigational interests that Peoples had made application for permission to install a pipeline. Consistent with the permit's technical drawings, the public notice stated that "[t]he proposed pipe line will be [installed] at least 15 feet below pool full elevation ... or 4 feet below the bed of the river, whichever is the greater, for the width of the channel and 4 feet below the surface of the ground on each bank." *See* Corps of Engineer Public Notice, Joint Trial Exhibit No. 4. No objections were made and the permit was issued.

10. Shortly after Peoples had completed its construction of the pipeline, the Corps' Operation and Maintenance Division inspected the pipeline and determined that the installation had been done in accordance with the permit. Peoples thereafter submitted a profile of the submerged pipeline which was obtained by soundings. The profile also indicated that the location of the pipeline was in conformity with the permit.

11. On October 3, 1961, a marine diving contractor inspected Peoples' pipeline and

discovered that approximately 40 feet from the western shore, a 15 feet section of the pipe was exposed above the riverbed, that the river bottom immediately below the pipe was washed-out, and that barges with a draft of 8 and ½ feet crossed directly over the exposed section of the pipeline to access the petroleum dock. The diver reported his findings to Peoples and suggested that Peoples jet out the river bottom beneath the pipeline for a distance of 250 feet from the western shore and lower the pipeline to a depth of 12 feet below the river's surface. The diver opined that his recommendation would facilitate access to the petroleum dock by barges with drafts of 9 and ½ to 10 feet without hazard to Peoples' pipeline.

12. Shortly following the diver's inspection, Peoples made application to the Corps to riprap a 20 feet section of the pipeline. Riprapping is a technique whereby a quantity of broken stones or other masonry materials are thrown together irregularly to build a wall, foundation or reventment of an embankment. Peoples believed that the pipeline's exposure resulted from docking activity at the petroleum dock. The technical drawing attached to Peoples application made specific engineering recommendations that the exposed area be riprapped with a material other than concrete. The permit was granted and notice of the repair was given. Contrary to the specific engineering recommendation against using concrete, Peoples riprapped the exposed pipeline using sakrete ", a trademarked product consisting of a pre-mixed dry concrete formula in a sack. Upon completion of the pipeline repair, Peoples notified the Corps that it had riprapped a 30 feet section of the pipeline and submitted a profile of the pipeline in the river after the repair had been made.

13. Following the repairs, Peoples' pipeline was not inspected for exposure again until September 4, 1979, almost 18 years after the repairs. During this inspection the diver, using neither a probe nor an electronic device to determine the pipeline's depth beneath the riverbed, made a visual inspection, zigzagging north and south over the pipeline. In his report the diver concluded that the pipeline was completely covered. At trial, however, the diver conceded that by using a zigzagging technique he may not have visually inspected the entire riverbed along the pipeline's path. Nor did his inspection reveal how deep the pipeline was buried.

14. Peoples' pipeline was installed approximately 350 feet downstream from the northern mouth of the Reserve Petroleum Dock. The location of the pipeline crossing is marked on navigation charts and by billboard signs posted on both banks of the river. The signs contain the following notice to mariners:

CAUTION

**DO NOT ANCHOR**

**OR DREDGE**

Gas Pipeline Crossing

Peoples Natural Gas Company

15. On the day of the collision which gave rise to this lawsuit, about 40 feet from the western shore of the Monongahela River a 15 to 20 feet section of Peoples' pipeline sat exposed on top of the riverbed.

16. The Aetna Louisville, a large and powerful towboat is 150 feet long and 50 feet wide, with a draft of 8 feet 3 inches to 8 feet 6 inches. It has three propellers, each 8 feet in diameter and powered by a separate 1,600 horsepower engine. The towboat's propellers are shielded by cort nozzles constructed of 6 inches thick plate steel. The evidence indicates that towboats of similar size, draft and horsepower regularly operate on the Monongahela River in the channel area where Peoples' pipeline was ruptured.

17. Oil barge S–233, a large petroleum barge, is 295 feet long and 52 and ½ feet wide, with a draft on the day of the acci-

dent of 6 to 7 feet. Barge S–233, which is similar in size to other barges spotted at the Reserve Petroleum Dock, had been previously used to deliver petroleum products to that docking facility. Oil barge S–233 and the Aetna Louisville has a combined length of 445 feet.

18. The collision between the Aetna Louisville and Peoples' pipeline occurred 330 feet north of the Reserve Petroleum Dock while the towboat's captain was attempting to remove an empty oil barge (C–236) from the dock and spot a partially loaded oil barge (S–233) in its place. The pipeline was ruptured 40 feet from the western shore of the river.

19. On the day of the collision, oil barge C–236 sat empty in the Reserve Petroleum Dock. At ten o'clock that evening, the Aetna Louisville's captain, pushing barge S–233, maneuvered the port side of the barge at a slight angle approximately 5 feet into the northern end of the dock's chamber walls. The towboat's crew attached cable lines from barge S–233 to the empty barge and the captain slowly reversed his vessel, pulling both barges downstream and toward the river channel's center.

20. After the empty barge was completely clear of the lock chamber walls, the captain maneuvered the empty barge around to the towboat's port side. During this procedure, the towboats starboard, stern side bumped the river bottom near the western shore. The empty oil barge was then securely fastened to the towboat's port side.

21. With the empty oil barge secured to its port side and barge 2–333 at its bow, the captain prepared the vessel for its approach into the lock chamber walls. The bow of barge S–233 again was maneuvered at a slight angle approximately 5 feet into the northern end of the lock chamber and brought to a complete stop. By crossing the vessel's rudders, the captain moved the towboat toward the western shore of the river to align barge S–233 parallel to the

lock chamber walls and then made his final approach into the dock.

22. Proceeding at "dead slow" speed— coasting with the clutch disengaged and the propellers stationary—the towboat's captain pushed barge S–233 directly between the lock chamber walls. As the towboat crossed over Peoples' pipeline, the captain felt his vessel tremble: the Aetna Louisville had struck and ruptured Peoples' natural gas pipeline. When bubbles, followed by a geyser, emerged from the starboard side of the towboat about 40 feet from the river's western shore, the United States Coast Guard was immediately notified.

23. Captain Dent knew of Peoples' pipeline crossing from navigation charts and billboard signs on the river banks, but did not know that a 15 to 20 feet section of Peoples' pipeline sat exposed on top of the riverbed.

## II. CONCLUSIONS OF LAW.

1. This Court has jurisdiction of this admiralty and maritime tort collision case.

2. The presumption of negligence flowing from a moving vessel striking a stationary object serves no useful purpose in this case because the defendant has presented sufficient credible evidence to rebut the presumption that its vessel was negligent merely because it struck a stationary pipeline.

3. The scope of a towboat pilot's duty of due care is determined by what he knew or should have known at the time of a collision. In this case the towboat captain could not have foreseen that Peoples' pipeline sat exposed on top of the riverbed and therefore had no duty of due care to the pipeline in its exposed condition.

4. Under the facts of this case the towboat captain was not negligent in the operation of his vessel. A towboat pilot is only required to exercise the ordinary degree of care and skill commonly possessed by others in his profession. Peoples has failed to

prove by a fair preponderance of the evidence that the towboat captain operated his vessel in a manner in which nautical experience and good seamanship would condemn as unreasonable under the circumstances. This Court therefore holds that Captain Dent operated his vessel reasonably and prudently under the circumstances.

5. The rule of statutory fault established by the United States Supreme Court in *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873), places the burden on the party who violates navigational rules to prove that his rule violation could not have been a cause of the marine collision. This Court holds that Peoples' pipeline created an obstruction to navigation on the Monongahela River and that the terms of the United States Corps of Engineers' permit were violated because Peoples' failed to maintain its pipeline 4 feet below the riverbed. *The Pennsylvania* rule therefore applies in this case because Peoples violated an express congressional mandate that navigable waters be free from obstruction and violated the terms of the Corps' permit, both of which are rules designed to prevent marine collisions.

6. Peoples has not met its heavy burden under *The Pennsylvania* of proving that its statutory violations could not have been a cause of the collision. Accordingly, this Court holds that Peoples' exposed pipeline was the sole cause of the collision in this case.

### III. DISCUSSION.

■ This is a case under admiralty and maritime jurisdiction. Although commonly admiralty collision cases involve collisions between two moving vessels, the same rules generally regulate accidents between a moving ship and a stationary ship or a fixed object. *See Orange Beach Water, Sewer And Fire Protection Authority v. M/V Alva,* 680 F.2d 1374 (11th Cir.1982); *The Honeybrook,* 6 F.2d 736 (2d Cir.1925); *Marathon Pipe Line Co. v. Drilling Rig Rowan/Odessa,* 527 F.Supp. 824 (E.D.La. 1981), *aff'd.,* 699 F.2d 240 (5th Cir.1983). Under admiralty jurisdiction in torts arising from collisions, the term collision is used in its broadest sense to encompass every case where a vessel strikes another vessel or some object afloat or not. *See* Admiralty Jurisdiction Extension Act, 46 U.C.S. § 740 (1948). *See also Rodrigue v. Aetna Casualty Co.,* 395 U.S. 352, 360, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969).

■ Under maritime tort law, "collision liability is based on fault; the mere fact of impact has no legal consequence." *See The Java,* 81 U.S. (14 Wall.) 189, 20 L.Ed. 834 (1871). For it is axiomatic in admiralty cases that "[t]he liability for damages is upon the ship or ships whose fault caused the injury." *See The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1874); *Stainback v. Rae,* 55 U.S. (14 How.) 532, 538, 14 L.Ed. 530 (1852). The test of fault is simply whether the vessel's navigator has acted as a reasonably prudent mariner under the circumstances of the case.

■ To apply the test of fault in admiralty cases, the navigator's conduct is measured against accepted standards of navigation. These standards are derived from the statutory rules of navigation, regulations having the full force of law, proved local custom not contradicting statutory rules, and the requirements of due care and good seamanship. *See generally,* Gilmore & Black, *The Law of Admiralty,* § 7–3, at 488 (2d ed. 1975) and authority cited therein. Collectively, these rules prescribe the speed at which a vessel may travel, the lights it must display, the sounds and signals it must emit, the maneuvers it must make when encountering another vessel, and among other things, the vessels conduct in inclement weather.

■ Conceptually, maritime collision law is analogous to automobile accident law: the general principles are similar and both activities are statutorily regulated. As a practical matter, because marine vessels are far less maneuverable than land-bound vehicles, a plethora of statutes and regulations have evolved to eliminate the risk of marine collisions and to facilitate navigation. Unlike landbased tort collision law,

however, violation of the maritime rules of the road constitutes statutory fault, a doctrine conceptually akin to the negligence per se doctrine. *See, e.g., Jinks v. Currie,* 324 Pa. 532, 188 A. 356 (1936); *Gaskill v. Melella,* 144 Pa.Super. 78, 18 A.2d 455 (1941).

The doctrine of statutory fault grew out of the need to enforce strict obedience to maritime rules designed to prevent collisions. In 1893, in a case involving a collision between two vessels in violation of maritime rules, the Supreme Court declared that:

> when … a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributing cause of the disaster. In such a case the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been. Such a rule is necessary to enforce obedience to the mandate of the statute.

*The Pennsylvania,* 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873). In order to escape liability following *The Pennsylvania* decision, violaters of the mariner's rules of the road were laden with the heavy burden of proving that their violation was not a cause in fact of the collision.

 If admiralty law fails to provide a standard, marine collision liability turns on traditional tort law principles. *See S.C. Loveland, Inc. v. East West Towing, Inc.,* 608 F.2d 160, 165 (5th Cir.1979). Absent statutory violations, the breach of a vessel's duty of prudent seamanship will not give rise to liability unless it is sufficiently proved that the breach was the cause in fact of the collision. *See, e.g. Oriental Trading & Transport Co. v. Gulf Oil Corp.,* 173 F.2d 108, 110 (2d Cir.), *cert. denied,* 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1729 (1949).

In this case Peoples does not allege nor did the evidence demonstrate that the defendant violated any statutory rule de-

signed to prevent marine collisions. It remains an open question of whether regulations requiring due care in navigation make all maritime negligence claims a matter of statutory fault. *Cf. Anthony v. International Paper Co.,* 289 F.2d 574 (4th Cir. 1961) *with, Oriental Trading & Transport Co. v. Gulf Oil Corp.,* 173 F.2d 108 (2d Cir.), *cert. denied,* 337 U.S. 919, 69 S.Ct. 1162, 93 L.Ed. 1729 (1949). *See also* Gilmore & Black, *supra* at 497. If so, deviation from the accepted standards of due care, would shift the rebuttal burden of causation to the pilot to prove his negligence did not cause the accident. This question need not be answered here because Peoples relies, not upon statutory fault, but upon two district court cases holding that a vessel is presumptively liable for a collision if it strikes a stationary object. *See Patterson Terminals, Inc. v. S.S. Johannes Frans,* 209 F.Supp. 705, 707 (E.D.Pa.1962); *Patterson Oil Terminals v. The Port Covington.,* 109 F.Supp. 953, 954 (E.D.Pa.1952), *aff'd,* 205 F.2d 694 (3d Cir.1953).

During its closing argument and in its proposed findings of fact and conclusions of law, Peoples relied heavily on the presumption of negligence flowing from the Aetna Louisville striking Peoples' pipeline. In summation, Peoples argued that the defendant had failed to overcome the presumption of negligence and was therefore liable for the damages to Peoples' pipeline. Not only does Peoples overstate the function of the presumption of negligence, but its reliance on the presumption in this case is misplaced.

In his treatise on evidence, Wigmore explains that a presumption is merely a rule of law attaching to one evidentiary fact certain procedural consequences as to the duty of production of other evidence. The "presumption is not the fact itself, nor the inference itself, but the legal consequence attached to it." 9 J. Wigmore, *Wigmore on Evidence* § 2491, at 304 (Chadbourn rev. ed. 1981). In operation, the presumption merely compels the fact-finder to reach a presumed fact "in the absence of evi-

dence to the contrary from the opponent. If the opponent does offer evidence to the contrary ... the presumption disappears as a rule of law and the case is in the [factfinder's] hands free from any rule." *Id.* at 305.

■ Under the federal rules, presumptions place upon the opposing party the burden of establishing the nonexistence of the presumed fact, once the party invoking the presumption establishes the basic fact. *See* Fed.R.Evid. 301. The advisory committee, however, rejects the so-called bursting bubble theory where the presumption vanishes upon the introduction of contrary evidence. *See* Fed.R.Evid. advisory committee note 301.

■ Apparently Peoples seeks to rely on the presumption of negligence as a make weight in the evidence to tip the scales in its favor. This notion has been previously considered and rejected. *See Pennsylvania Railroad Co. v. S.S. Marie Leonhardt,* 320 F.2d 262, 264 (3d Cir.1963). Here, the defendant has fully presented evidence rebutting the presumption that its vessel was negligent because it struck a stationary pipeline. In any event, no probative value can be attached solely to the fact that the Aetna Louisville struck a stationary object. The mere fact of collision between a moving vessel and a submarine pipeline furnishes no basis for any inference that the mishap was caused by the negligence of the vessel, of the pipeline, of both or without the fault of either. *Accord Western & Atlantic Railroad Co. v. Henderson,* 279 U.S. 639, 642–43, 49 S.Ct. 445, 447, 73 L.Ed. 884 (1929). In this case, the presumption of negligence so pales in the face of contrary evidence that it is safe to conclude that the presumption has completely vanished or has been sufficiently rebutted by the defendant.

■ At trial, as outlined in its complaint, Peoples proceeded under the theory that the towboat's pilot was negligent in maneuvering its vessel near the western shore of the Monongahela River, causing the vessel to strike the river bottom over Peoples' pipeline, and failing to heed navigational charts and billboard signs indicating the presence of a submarine pipeline. Given the river's shore-side depth, Peoples argued that under the circumstances the pilot's method of spotting the oil barge was unreasonable and imprudent.

The towboat's captain, Eugene H. Dent, a licensed pilot with over 20 years of experience, testified that he had used the same spotting procedure at the Reserve Petroleum Dock on several previous occasions and under similar river conditions. In those instances, he had docked barges without incident. Captain Dent acknowledged that he knew the location of the pipeline crossing from navigation charts and billboards posted on the river banks, but thought that all pipes were submerged below the riverbed.

The Reserve Petroleum Dock's Terminal Manager, who occasionally spotted barges himself, testified that all experienced pilots used the same docking procedure that Captain Dent had used. In his opinion, Captain Dent's procedure was not merely the preferred method, but the only effective way to spot large oil barges at that docking site.

Captain Jack Ross, also an experienced and licensed towboat pilot, testified that the spotting procedure used by Captain Dent provided sure and positive control over the tow and afforded the pilot good visibility. Considering the precarious location of docking facility along the river's curve, Ross opined that control and visibility were pointed factors in spotting oil barges. In reaching his opinion, Ross cited the impaired visibility from the high lock walls and the danger of fire and explosion if a petroleum oil barge is punctured. Captain Ross stated that he believed within a reasonable degree of navigational certainty that Dent had operated the Aetna Louisville in a reasonable and prudent manner.

Captain Stanley Lysicki, called by Peoples, testified that Captain Dent should have used an alternative docking procedure. Captain Lysicki, although a master pilot with over 35 years of navigational experience, had never spotted an oil barge

at the Reserve Petroleum Dock, or spotted a barge between two walls. Captain Lysicki's experience was limited to sand and gravel barges. Captain Lysicki opined, however, that in view of the pipeline crossing, changing water depth and river conditions, Captain Dent should have used a docking method which would not have endangered Peoples' pipeline. In his report, Lysicki suggested several alternative docking methods, including a "hiptow" procedure. Captain Dent testified that he didn't use Lysicki's methods because they would have impaired the maneuverability and steering of the Aetna Louisville and her tow.

Captain Ross sternly critizied Lysicki's suggested docking methods because, in his opinion, they lacked the control and unimpaired visibility offered by the procedure used by Dent. Ross argued that the hiptowing technique was only useful when spotting a small barge in an open dock. According to Ross, hiptowing was an unsafe procedure to use when docking large oil barges at the Reserve Petroleum Dock. When pressed at trial, Captain Lysicki stood by his assertion that he would have used a docking procedure different from the one Captain Dent used, but admitted that if, like Dent, he had used the same procedure on previous occasions without incident, he would have used Dent's method on a subsequent occasion. On cross examination, Lysicki further admitted that under the facts of this case, he could not state that Captain Dent had operated the Aetna Louisville in an unreasonable or imprudent manner.

The testimony of Captain Lysicki, the plaintiff's expert pilot called to establish Captain Dent's negligence, was equivocal at best, but in fairness tended to exonerate rather than discredit Dent's conduct. Also, although an experienced pilot, Captain Lysicki's testimony was of nominal probative value in this case because he had never spotted an oil barge. The evidence clearly demonstrated that in his testimony and report, Lysicki failed to adequately consider the danger of fire and explosion if an oil barge is punctured during the docking pro-

cedure. Lysicki had not encountered this peril in his extensive experience in docking sand and gravel barges.

Most importantly, however, Captain Lysicki admitted that if he were armed with the same facts available to Captain Dent at the time of the collision, he would have used the same procedure that Dent had used. Against this admission, it is of no moment that in light of hindsight Lysicki would have used an alternative docking procedure. A pilot is required to exercise only the ordinary degree of care and skill commonly possessed by others in the same field; he is not required to be prescient. *See generally, American Zinc Co. v. Foster,* 313 F.Supp. 671, 682 (S.D.Miss.1970), *modified,* 441 F.2d 1100 (5th Cir.), *cert. denied,* 404 U.S. 855, 92 S.Ct. 99, 30 L.Ed.2d 95 (1971). On this record, Peoples has failed to prove by a fair preponderance of the evidence that Captain Dent handled his vessel in a manner inconsistent with skilled nautical experience and good seamanship.

Moreover Captain Dent did not know nor should have known that Peoples' pipeline was uncovered and sitting on top of the riverbed. The Third Circuit has held that non-liability for unforeseeable results is a rule limiting the scope of duty, not a rule of causation. *See Diamond State Tel. Co. v. Atlantic Refining Co.,* 205 F.2d 402 (3d Cir.1953). *Compare Orange Beach Water,* 680 F.2d at 1381. In *Diamond State* a tanker struck a submarine telephone cable which had been raised to the deck of barges for repairs. The barges did not display three vertical red lights required by navigation rules for vessels performing cable work. Citing the landmark decision of *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), the *Diamond State* court held that the tanker "could not have possibly foreseen that poor navigation would have subject libellant's cable to any harm because they neither knew nor should have known that the cable was there. Thus, as to the cable, there was no duty and, consequently, could be no negligence." *Diamond State,* 205 F.2d at 407.

The *Diamond State* decision is particularly instructive because, like Peoples in the present case, the cable company in the *Diamond State* case argued that the location of the cable area was clearly marked on charts making the risk of harm foreseeable and thus giving rise to a duty of prudent navigation to the cable. The *Diamond State* court rejected that argument because it believed that markings on a chart that submarine cables were in the area was insufficient notice that a vessel had raised its cables to the deck. *Id.* at 407. Peoples attempts to buttress their notice argument by asserting that in addition to the pipeline being marked on navigation charts, its location is clearly indicated by billboard signs on the river banks and that the towboat's crew could have used weights or depth gauges to determine the depth of the river close to the shore. These arguments are equally unpersuasive.

Like the charts in *Diamond State*, the navigation charts and the billboard signs in this case only served notice that a pipeline crosses the river at a given point. Neither medium indicated that the pipeline sat uncovered on top of the riverbed. Nor would a depth gauge or weights have placed the towboat on notice of that fact. There is no dispute in the evidence that Captain Dent knew that a pipeline crossed the river, but relying on common sense and years of nautical experience, Dent expected the line to be submerged below the riverbed. Accordingly, the pilot's duty to the pipeline is to be determined by what he knew or should have known at the time, not by what we now know in hindsight. In this case Captain Dent could not have foreseen that Peoples' pipeline sat uncovered on the riverbed and therefore had no duty of due care to the exposed pipeline.

The defendant also seeks to invoke the operation of a presumption of law under *The Pennsylvania* rule which shifts a strict burden of causation to violaters of maritime rules. *See generally Garner v. Cities Service Tankers Corp.,* 456 F.2d 476, 480 (5th Cir.1972); *Green v. Crow,* 243 F.2d 401, 403 (5th Cir.1957). This Court holds that *The Pennsylvania* rule applies in this case because the evidence shows that Peoples violated statutory rules designed to prevent marine collisions by failing to maintain its pipeline below the riverbed.

The evidence regarding the condition of Peoples' pipeline before the collision preponderates but one conclusion: Peoples' pipeline sat uncovered on top of the riverbed prior to being struck and ruptured by defendant's towboat. Several years after Peoples originally installed its pipeline, its marine diver discovered that the pipeline was exposed approximately 40 feet from the western shore of the river, the same area where the pipeline was subsequently hit and ruptured by the defendant's towboat. Peoples attributed the exposure of its pipeline to the river traffic from oil barges accessing the petroleum dock in this area. The evidence demonstrated, however, that river currents cut soil away from the western riverbed and deposited soil on the eastern riverbed. This is a natural geological phenomenon, given the river's direction and curvature.

The defendant's engineer testified that under the circumstances the Aetna Louisville could not have dug Peoples' pipeline 4 feet out of the riverbed to rupture it. The engineer further testified that it was his expert opinion that the towboat struck and ruptured the pipeline as the pipeline sat on the riverbed. The engineer noted that the location, deformation, flattening and creasing of the pipeline were all consistent with the pipe having been struck as it sat on top of the riverbed. Several propeller marks on the ruptured pipeline were also instructive. Since the Aetna Louisville's propellers are covered by cort nozzles which prevented its propellers from striking the pipe, the engineer concluded that the pipeline had been exposed and hit by the propellers of other vessels prior to the accident. Moreover, the engineer testified that his examination revealed a preexisting fracture at the pipeline's breaking point. Peoples offered no credible testimony to con-

tradict the engineer's conclusions. This Court finds the engineers testimony logical, persuasive and trustworthy.

Finally, an experienced marine diver who surveyed the river's bottom using a sophisticated scan sonar technique, also concluded that prior to the collision the pipeline sat on top of the riverbed for a distance of approximately 83 feet. His sonar tracing revealed no evidence of a trench where Peoples claimed its pipeline was buried. Nor did the diver discover any riprapping material in the area where the pipeline had been previously repaired in 1961. The diver's testimony was also substantially uncontroverted and believed by this Court. Clearly the substantial weight of the evidence established that Peoples' pipeline sat on top of the riverbed prior to being struck by the defendant's towboat.

Congress has expressly declared that "[t]he creation of any obstruction ... to the navigable capacity of any waters of the United States is hereby prohibited...." *See* Obstruction to Navigable Waters, 33 U.S.C. § 403 (1899). This duty is said to extend to the entire width of the navigable waterway and is not, contrary to Peoples assertion, limited to the mid or dredged channels of the river. *See Orange Beach Water, Sewer And Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1382 (11th Cir.1982). Moreover, the duty to maintain a free and navigable channel is breached whenever a structure not initially an obstruction becomes one through improper maintenance. *Id.* at 1383.

Under the facts of this case, Peoples' pipeline unquestionably created an obstruction to navigation. Although Peoples' pipeline was struck close to the shore, the overwhelming weight of the credible evidence established that vessels with drafts similar to the Aetna Louisville frequently maneuvered close to the western shore of the river to access the Reserve Petroleum Dock. In the area where the pipeline was ruptured, Peoples had been warned by its marine diver years before the accident that towboats maneuvered directly over its pipeline close to the shore to spot oil barges.

The evidence also established that Peoples failed to maintain its Pipeline 4 feet below the riverbed for the width of the channel as required by the Corps' permit. Several courts have held that failure to comply with a term of the permit issued by the Corps triggers application of *The Pennsylvania* rule. *Accord Orange Beach Water*, 680 F.2d at 1383 and cases cited therein. This Court agrees. In addition, this Court holds that the congressional mandate that navigable waters be free from obstruction and the permit provision requiring Peoples' pipeline to be 4 feet below the riverbed were both designed to prevent the precise type of collision that occurred in this case. *See generally Orange Beach Water*, 680 F.2d at 1383; *Gulf Oil Corp. v. Tug Gulf Explorer*, 337 F.Supp. 709 (E.D.La.1971), *aff'd*, 472 F.2d 1406 (5th Cir.1973).

This Court need not expound on Peoples' burden under *The Pennsylvania* to prove that its statutory violations could not have been a cause of the collision in this case because the Aetna Louisville sustained no damages and sought to recover nothing by this suit. Were she damaged, however, *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), would require the allocation of liability in proportion to the relative fault of the parties. It is enough to note that the evidence established that Peoples failure to maintain its pipeline below the riverbed was the only cause of the collision. Since the exposed pipeline was the sole cause of the collision, Peoples must bear the entire responsibility for damages.

An appropriate order follows.