**RANGER INSURANCE
COMPANY, et al.**

v.

**EXXON PIPELINE COMPANY, et al.**

No. 88–0944.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

July 2, 1990.

John Craig Jones, John P. Wolff III,
John Nickerson Chappuis, Voorhies &
Labbe, Lafayette, La., for plaintiffs &
Broussard Bros.

John M. Roper and William H. Bennett,
III, New Orleans, La., for Exxon Corp.,

Exxon Pipeline Co. and Humble Oil and Refining Co.

## OPINION

SHAW, Chief Judge.

This matter was tried to the Court and the evidence left open for the submission of a deposition to be taken later. No further depositions have been submitted, and the note of evidence is now closed. The Court has considered the trial testimony, exhibits, and briefs and arguments of counsel, and finds in favor of plaintiffs, Ranger Insurance, Royal Indemnity Co., Americas Insurance Company, and Certain Underwriters at Lloyds, on the main demand and on the counterclaim, as set forth below.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Broussard Brothers' spud barge, the BB–19, and its tug, the M/V SQUAW, were involved in an accident on Bayou Patout in the pre-dawn hours of April 8, 1987. Plaintiffs are various insurance companies of Broussard Brothers, Inc. who paid claims under hull and protection and indemnity policies for property damage to the SQUAW and the BB–19 and for equipment damage under a contractor's equipment policy. This Court has jurisdiction over the subject matter of this suit under general maritime law and 28 U.S.C. sec. 1332 (diversity of citizenship).

As the BB–19 was approaching the Hwy. 83 Weeks Island Bridge over Bayou Patout, its spuds were slowly lowered because of concerns by the Captain that the top of the spud would engage power lines overhead. The right rear spud struck a gas pipeline now owned and operated by Exxon Company, U.S.A., a division of defendant Exxon Corporation. The gas line ruptured and an explosion and fire ensued.

On the main demand, plaintiffs seek reimbursement from defendants for claims paid to Broussard Brothers and its affiliates. Remaining defendants are Exxon Corporation and Humble Oil & Refining Co. (Exxon Pipeline Company has been dismissed under Rule 41(b).) Defendants'

counterclaim alleges negligence on the part of Broussard Brothers in lowering a spud without prior knowledge of the depth of the channel or the safety of sinking a spud in the area.

## THE MAIN DEMAND

Pipelines are generally laid below the mud line. The pipeline in question was built by defendant Humble Oil & Refining Co. and apparently buried below the mud line in 1953. The U.S. Corps of Engineers permit issued that year required that the line be buried and maintained at a minimum of 2 feet below the bed of Bayou Patout.

Even if it was buried in 1953, however, the pipeline was not buried in 1987. The profile of the bayou bottom had changed and the bayou had widened some 40 feet since the permit issued. From the testimony that marine growth was present around the pipeline and the drawing by the diver showing that the damaged section was unburied, the Court finds that the pipeline was above the mud line, suspended in the water at the time of the accident, and had probably been unburied for at least a year.

Exxon was not aware that the pipeline was unburied. Exxon personnel made daily visual inspections (in passing on the highway) to look for bubbles or pollution, but there were no Exxon inspection policies to insure that the pipeline did not become unburied from the mud bottom. Before the accident none of the Exxon people (including the field superintendent in charge of the area production) knew exactly where the pipeline was or where it crossed the bayou, but some knew the general location.

There was no sign by defendant marking the exact location of this pipeline. There was a sign of Exxon Pipeline Company warning of the existence of a petroleum pipeline some 50 feet earlier, but this sign was small and quite some distance from the water. The photographs in evidence show that it was partially obstructed from view from the bayou by tall grasses. *See* Exhibits P–14a, c, d, and P–15b and c.

■ Plaintiffs' case turns in part on the failure to warn. A prudent pipeline owner

or operator should warn of the crossing of a pipeline. There was no sign visible from the approach to the bridge at the area where the pipeline crossed.

■ Moreover, if Exxon maintains a pipeline above the mud line, it has a further duty to warn of this potential obstruction to navigation. This Court agrees with *Abdon Callais Boat Rentals, Inc. v. La. Power & Light Co.*, 555 So.2d 568 (La.App. 1st Cir.1989), *writ denied*, 558 So.2d 583 (La. 1990), that a general pipeline-crossing warning is not sufficient to warn of the presence of an unburied or exposed pipeline. Exxon failed to adequately warn of the pipeline crossing.

■ Additionally, Exxon was negligent in allowing its pipeline to become and remain exposed and in failing to maintain its depth at two feet below the mud line as required by the permit. *Accord Gulf Oil Corporation v. Tug Gulf Explorer*, 337 F.Supp. 709, 717 (E.D.La.1971), *aff'd*, 472 F.2d 1406 (5th Cir.1973). The duty to maintain a free and navigable channel is breached when a structure not initially an obstruction becomes one through improper maintenance.

■ The failure to comply with a permit issued by the Corps triggers the application of the rule of *The Pennsylvania*, that Exxon must show that its fault could not have been one of the causes of the allision between the vessel and the stationary object. *See The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1873); *Orange Beach Water Sewer, etc. v. M/V Alva*, 680 F.2d 1374, 1383 (11th Cir.1982), and cases cited therein. The evidence is to the contrary—*i.e.*, that Exxon's failure to maintain the pipeline buried two feet below the surface did cause the accident.

■ Finally, the Court holds that Exxon's inspection policies were deficient. The persons inspecting the area should have known the location of the pipeline, as well as its elevation. They could then have been alerted by surface changes in the bank (such as erosion or widening of the bayou) that further inspection was indicated. Probing or sounding the bottom should have been the next step to insure that the pipeline remained buried, below the navigable waters. A passing glance from the highway in the general direction of a pipeline—the precise location of which is unknown—does not fulfill Exxon's duty to protect against the hazard of its pipeline protruding into navigable waters.

The breach of the aforementioned duties constitutes negligence which proximately caused the property damage for which claims were paid by plaintiff-insurers.

Plaintiff-subrogees seek $351,119.70 for claims paid, comprised of payments of $136,301.70 on the SQUAW, $14,818.00 on the BB–19, and $200,000 (in compromise) on the crane and equipment, as follows:

Royal Indemnity Company paid $40,-890.51 on July 23, 1987 (30% of the loss on the SQUAW); and $4,445.40 on September 3, 1987 (30% of the loss on the BB–19);

Southern Marine & Aviation Underwriters, Inc. paid on behalf of Americas Insurance Company $27,260.34 on August 7, 1987 (20% of the loss on the SQUAW); and $2,963.60 on August 26, 1987 (20% of the loss on the BB–19);

Adams & Porter International, Inc., paid on behalf of Certain Underwriters at Lloyds, London $27,260.34 on August 10, 1987 (20% of the loss on the SQUAW); $2,963.60 on September 4, 1987 (20% of the loss on the BB–19); and $100,000 on August 25, 1987 (50% of the settlement on the crane and equipment); and

Texas Marine Underwriters Agency, Inc. paid on behalf of Ranger Insurance Company $40,890.51 on June 30, 1987 (30% of the loss of the SQUAW); $4,445.40 on August 14, 1987 (30% of the loss of the BB–19); and $100,000 on July 15, 1987 (50% of the settlement on the crane and equipment).

The Court finds that the claims paid represent the reasonable cost of repair or replacement, and that the compromise paid was reasonable. Accordingly, the Court awards the full amounts paid, apportioned among the plaintiff-insurers according to the amounts paid, as set forth above.

**100**

THE COUNTERCLAIM

█ Defendant Exxon likewise claims that its property damage was caused by the negligence of the BB–19 and SQUAW and/or their operations.

Roland Faulk, Jr., who was in charge of operations on the BB–19 the morning of the accident, had not been through the bridge before. The tug captain, Rodney Choate, called to Faulk to advise him of the powerline. Faulk asked Choate whether any pipelines were present and shined lights along the shore to see whether any signs indicated the presence of pipelines. A pipeline warning sign was not apparent from their position. A spike pole was available to check the depth, but it was not used.

The barge was drifting at slower-than-walking speed, less than one mile-per-hour, and the tug was in "clutch"—not in gear. Watching the bridge approach and the powerlines, Faulk gave a signal to lower the spud "about five feet." The first spud passed the area of the pipeline without incident. The rear spud, supposedly lowered "about five feet" also, struck the pipeline and caused the explosion. The normal practice is to lower about five feet in case of overhead obstructions.

Faulk was relying on Choate's instruction to lower the spud, and assumed Choate knew that the bayou's depth would allow the spud. There is normally about 10 feet of water in canals such as Bayou Patout. The bayou, however, is not a maintained channel, kept at a regulated depth. Choate had experience going through the bridge and knew barges went safely through with loads with draft markers showing an average draw of 7 to 7½ feet. He had 5–6 years familiarity with the bayou. He thought but did not know that the bayou was over 10 feet deep there. Choate did not know the height of the powerline. He thought the barge drew 4 to 4½ feet and thought that lowering the spuds 4 to 5 feet—increasing the draft of the vessel to 8 to 9½ feet—would present no problem.

The Court finds that the spuds were not driven into the bottom or dragged along the bottom before striking the line. Had the pipeline been buried two feet, the spud would not have ruptured the pipeline. Rather, the evidence shows that the captain, master and crews of the vessels were alert to the slightest indications of hitting bottom, as they proceeded slowly and slowly lowered the spud.

There was some evidence elicited by Exxon that the spuds were lowered quickly and must have been lowered more than 9½ feet to strike the pipeline. Additionally, there was convincing evidence that the powerlines overhead were high enough that the barge could have proceeded without lowering the spuds. The Court nevertheless finds from a preponderance of the evidence that the captain of the tug and operator of the barge were not negligent, that they proceeded with caution and lowered the spud slowly, after spotlighting the overhead lines and judging that the spuds needed to be lowered to pass safely, and looking for signs or warnings for a pipeline.

█ Moreover, the Court holds that the precise height of the powerlines, depth of the channel, and depth that the spuds were lowered are not crucial to the finding of no liability for vessel negligence. Even if there was negligence in lowering the spud, such negligence did not proximately cause the injuries in this case. The most damage the tug captain or barge operator might have reasonably foreseen was to drag bottom or hit a natural obstruction such as a stump or sandbar. At such a low speed, such risks might reasonably be expected to stall their progress, bend a spud, or throw the tow off course as it approached the bridge by causing it to pivot around the spud. There was no reason to expect an explosion from a pipeline under the barge, and it was a reasonable assumption that no pipeline would be suspended in the water above the mud line.

There being no negligence on the part of Broussard Brothers' employees or the vessels and no proximate causation, the Court denies relief on the counterclaim.

For the foregoing reasons, the Court finds in favor of plaintiffs both on the main demand (except as to defendant Exxon

Pipeline Company) and on the counterclaim. Prejudgment interest will be awarded at the rate of 8.06% from the date of judicial demand. Plaintiffs' counsel is requested to submit proposed form of judgment to opposing counsel and to the Court within 10 days of issuance of this opinion.