TEXAS EASTERN TRANSMISSION CORPORATION, Plaintiff,

v.

**TUG CAPTAIN DANN, her tackle, engines, boilers, etc. in rem, and Dann Ocean Towing, Inc., Defendants.**

No. 93 Civ. 0118 (BN).

United States District Court, S.D. New York.

Sept. 6, 1995.

Chalos & Brown, P.C., Edward P. Flood and Stephan Skoufalos, New York City, for plaintiff.

Connell Losquadro & Zerbo, William F. Losquadro and Donna Marie Zerbo, New York City, for defendants.

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior Judge of the United States Court of International Trade, sitting as a United States District judge by designation:

### *INTRODUCTION*

This is an admiralty action within the meaning of Rule 9(h), Fed.R.Civ.P., and jurisdiction is predicated on 28 U.S.C. § 1333. The suit arises out of an allision occurring on November 24, 1990 between tank barge B No. 55 ("the barge") while in tow of tugboat CAPTAIN DANN and plaintiff's underwater natural gas pipeline 1R which crosses the Arthur Kill River ("Arthur Kill") between New Jersey and New York.

The gravamen of the complaint is that the barge punctured the pipeline due to defen-

dants' statutory violations in operating the tug without a lookout and from the lower rather than upper pilothouse, and negligence in navigating and grounding the barge on plaintiff's pipeline in shallow waters outside the main ship channel of the river close to the Staten Island shore and in a designated pipeline area. Recovery of damages in the sum of $299,372.59 are sought by plaintiff based on the costs incurred in replacing the damaged section of pipeline, plus prejudgment interest.

Tug operator Dann Ocean Towing, Inc. ("Dann") denies any negligence and claims that the allision was due solely to plaintiff's negligent violation of the terms, conditions, and obligations of its permits issued by the United States Army Corp of Engineers ("ACOE") and statutory and regulatory violations. The alleged violations all revolve around plaintiff's negligence in failing to maintain adequate cover over its pipeline, which at the time and place of the allision was exposed above the riverbed creating an unlawful obstruction to navigation in Arthur Kill.

The action was tried to the court commencing on April 26, 1995 and concluding on May 3, 1995. For the reasons that follow, the court dismisses the complaint.[1]

### THE FACTS

Plaintiff, Texas Eastern Transmission Corporation ("Texas Eastern"), headquartered in Houston, Texas, operates an interstate natural gas pipeline system and owns the submerged sixteen inch natural gas pipeline 1R crossing the Arthur Kill between Linden, New Jersey and Gulfport, Staten Island, New York. Defendant Dann, of Tampa, Florida, engages in the business of owning and operating tugboats, and owns and operates CAPTAIN DANN. The barge is owned by Bouchard Transportation Co., Inc., unrelated to Dann and not a party to this suit.

Pipeline 1R was installed by Texas Eastern under a permit (exh. 7) issued on June 9, 1950 by the ACOE pursuant to its statutory authority under the River and Harbor Act of 1899, § 10, 33 U.S.C. § 403. Such permit authorized plaintiff to install the pipeline in accordance with plans and drawings attached to the permit. A profile drawing attached to and incorporated in the permit depicts the pipeline buried beneath the surface of the river bottom from shore to shore and also indicates that the pipeline would be installed at a minimum depth of 42 feet below mean low tide in the main ship channel.

In 1959, Texas Eastern surveyed the pipeline to determine how it was actually installed (as opposed to how it was proposed to be installed), and the survey findings were placed on a drawing (exh. 8) described as "Revised to as-built, May 15, 1959" and submitted to the ACOE. There is nothing in the record indicating that the ACOE made any objection to, or found anything improper, concerning the pipeline's actual installation as shown on the "as built" drawing.

The width of Arthur Kill from bank to bank where Line 1R crosses the river is approximately 1000–1500 feet. The width of the "federal project channel" (main deep water ship channel that is dredged and maintained by the ACOE) at the site of the 1R pipeline crossing is approximately 500–600 feet as depicted on the official navigation chart of the National Oceanic and Atmosphere Administration ("NOAA chart"). The NOAA chart is used by mariners in navigating the Arthur Kill. The waters east of the main channel toward the Staten Island side, where the allision occurred, become quite shallow approaching the shoreline, but nonetheless are subject to vessel traffic on the river.

While vessels travelling at normal operating speed enroute to a particular destination will generally navigate inside the project channel in both directions, as discussed *infra*, at the time of the allision CAPTAIN DANN, with the barge in tow, was maneuvering in the river outside and east of the project channel and near the Staten Island shore while waiting to berth at the Exxon Bayway facility on the New Jersey side some two-

---

1. This matter was reassigned to the writer via regular channels from the Honorable Kimba M. Wood, United States District Judge, on February 17, 1995. Post-trial briefing was completed by the parties on June 30, 1995.

tenths of a mile away. The Arthur Kill east of the main channel is frequently used by mariners when turning in the river.

Line 1R is located within a designated "Pipeline Area" as denoted on the NOAA chart. Texas Eastern maintains warning signs on shore stating "WARNING/DO NOT ANCHOR OR DREDGE" on both sides of the Arthur Kill at the crossing site. The R1 pipeline emerged from shallow water at a certain point near the New Jersey side of the river, and hence was visible to the eye at such point and is shown on the NOAA chart by an "obstruction" symbol. Significantly, however, the R1 pipeline did not similarly emerge from the water on the Staten Island side in the vicinity of the allision, but was submerged, and therefore, not visible to mariners. At night, which is when the allision occurred, the only illumination near the vicinity of the allision came from the Exxon refinery facility on the opposite (New Jersey) side of the river approximately one-quarter to one-half mile away.

In 1974, Texas Eastern engaged engineers Pyburn & Odum ("P & O") to perform a river bottom survey on May 2, 1974. The 1974 survey revealed that through the erosion of cover, the pipeline had become exposed above the riverbed near the New Jersey *and* Staten Island shores; in point of fact, a section of the exposed pipeline in the vicinity of the CAPTAIN DANN incident on the Staten Island side was flattened, requiring complete replacement. Prior to making repairs, Texas Eastern applied for and obtained the required permits from the ACOE, New York State and City authorizing remedial work to replace the damaged section of pipeline and to cover it with stone "rip rap."

In a letter dated October 25, 1974 by W.E. Graham, Manager of Rights of Way for Texas Eastern, to Phillip McGrade, Chief, Construction Permits Section of the ACOE, Graham describes the findings of the May 2, 1974 survey as follows (exh. D):

The subject pipeline has become exposed on both banks *outside of the limits of the navigation channel* and the pipe has been flattened at one point on the New York side of the channel. *The exposed pipe [outside the navigation channel] consti-* *tutes a hazard to navigation as well as to the integrity of the pipeline.* [Emphasis added.]

Accompanying this letter was an ACOE form signed by Graham stating *inter alia* that the purpose of the proposed remedial work was to replace the cover over the exposed pipe *outside* the main channel *to eliminate a hazard to navigation,* and a Texas Eastern drawing showing the exposed section of pipe in the vicinity of where the CAPTAIN DANN incident would later occur.

The ACOE issued a Letter of Permission dated August 29, 1975 to Texas Eastern authorizing remedial work "*in or affecting navigable waters of the United States*" including repair of the damaged section of pipeline and placement of rip rap over the exposed section "in accordance with the plans and drawing attached hereto which are incorporated in and made part of this authorization." Plft's exh. 9 and Def't's Exh. D (emphasis added).

The Letter of Permission expressly recognized and stressed to the permittee that the section of pipeline near the Staten Island shore to be repaired and covered was in navigable waters and thus the permit required, *inter alia:* "That the permittee [Texas Eastern] shall maintain the structure or work authorized * * * in accordance with the plans and drawings attached hereto"; "[t]hat no attempt shall be made by the permittee to prevent the full and free use by the public of all navigable waters at or adjacent to the activity authorized by this authorization"; and "[t]hat there shall be no unreasonable interference with navigation by the existence or use of the activity authorized herein."

In 1976 Texas Eastern completed the replacement of the damaged section of pipeline near the Staten Island shore and covered such section with two feet of stone "rip-rap," as authorized by ACOE and in compliance with the guidelines for cover set forth in the Natural Gas Pipeline Safety Act of 1968, 49 C.F.R. Part 192. The new installation of 80 feet of pipeline and rip rap cover left the pertinent section of pipeline installed at an elevation higher than initially proposed, and raised the pipeline in that area above the

riverbed. The remedial work was reinspected by P & O on February 16, 1976, and the 1976 survey findings are noted on Texas Eastern's Plan and Profile Drawing dated May 30, 1974, which was updated February 16, 1976 (exh. A).

In 1984, Texas Eastern retained P & O to perform a new bottom survey—shore to shore—of Line 1R, updating the previous surveys, which is plotted on their February 3, 1984 survey findings (exh. B). In the course of that new survey, a seventeen lineal foot section of pipeline on the river bottom in the vicinity of the Staten Island shore was *again found exposed*, in fact the very same vicinity near the Staten Island shore where the pipeline was covered by rip rap following the 1974 survey, and where the CAPTAIN DANN incident would later occur. Obviously, the rip rap cover placed over the exposed pipeline above the riverbed at this location in 1976 failed to remain in place, as had the original cover over the pipeline.

Plaintiff could produce no eyewitness, documentary evidence, or any record in the files of Texas Eastern or from any other source establishing that the exposed section of pipeline was, in fact, again re-covered with rip rap following the 1984 survey findings. However, plaintiff's witness Roy Hartstein, Texas Eastern's Northeast Region Technical Operations Superintendent from 1989 to 1994, who was in charge of operations, inspections and overseeing pipeline maintenance, including Line 1R, explained that remedial work would have been performed at the time of the 1985 "uprating" project and such remedial work would have been permissible, without further ACOE authorization, under the 1976 ACOE Letter of Permission. Hartstein, had no knowledge of how much rip rap cover would have been used at that time.

Absent affirmative contradictory evidence, the court accepts as credible Hartstein's belief that the exposed section of pipeline would have again been re-covered with rip rap in 1985 in accordance with the Letter of Permission issued in 1976. However, Hartstein's opinion, based on exhibit 18a (photograph of exposed pipeline taken shortly after the allision), that the pipeline in the vicinity

of the CAPTAIN DANN incident was *covered at the time of the allision in 1990* is rejected in light of more probative and credible evidence of the condition of the pipeline at the time of the allision, as discussed *infra.*

No bottom or diving surveys were conducted on behalf of Texas Eastern following the 1985 survey prior the allision in 1990. Rather, to monitor whether there was a recurrence of the erosion and exposure of pipeline which would again have to be re-covered, Texas Eastern relied on vehicular patrols, where the inspector presumably got out of the vehicle and went to the river's edge to "take a look." Defendants contend, and the court agrees, such inspections were woefully inadequate to reveal further erosion of the rip rap cover and whether submerged pipeline was again exposed or inadequately covered. Significantly, the existence of exposed pipeline in the area of the CAPTAIN DANN incident was discovered only by bottom surveys, as in 1976 (when a section of pipeline had been "flattened"), and again in 1985.

Further, notwithstanding the vehicular inspections, the photograph taken two days after the allision (exh. 18a) shows rip-rap inshore of the contact point, but only "a couple of stones on the top" of Line 1R in the exact area found to be exposed in 1985. Tr. 877–878. Hence, a logical inference to be drawn from the evidence is that even granting that the section of pipeline where the rip-rap was found to have been eroded in 1985 was re-covered with rip-rap sometime after 1985, as Hartstein believed would have occurred, such cover again eroded to the point of exposure of the pipeline prior to the allision in 1990. Such erosion was never discovered by the vehicular inspections.

In addition, the court gives little weight to Hartstein's testimony regarding his visit to the R1 crossing site in 1988, two years prior to the allision, since there is no evidence that at the time of day and state of the tide, he could have observed the condition of the cover over the submerged pipeline in the area of the allision, considering there were substantial tidal changes between mean low water and mean high water.

Essentially, then, the court finds that it was the bottom surveys in 1976 and 1985 that revealed the pipeline was exposed; that under the circumstances, such recurrence of erosion put plaintiff on notice that there might be future recurrences; that in fact at the time and place of the allision, the erosion of the rip-rap cover installed in 1976, and again sometime after 1985, had recurred leaving the pipeline in the vicinity of the CAPTAIN DANN incident exposed in 1990; and the vehicular inspections of the pipeline conducted by Texas Eastern following the recurrence of erosion in 1985 constituted very ineffective and imprudent monitoring of the pipeline's cover, and consequently, the new erosion existing on the date of the allision was not discovered by Texas Eastern.

CAPTAIN DANN is a steel hull tugboat measuring 114 feet in length and 33 feet in breadth. The tug has an upper and a lower operational pilothouse, the upper being 20 feet higher than the lower. Obviously, visible objects may be better viewed from the upper pilothouse in the event there is a restricted view from the lower pilothouse. At the time of the allision, CAPTAIN DANN carried a crew of six, including Captain Robert Gossett and Mate James Loflin, referred to *infra*.

Barge B No. 55, which allided with the pipeline, is a typical tank barge measuring 300 feet in length and 58 feet in width. At the relevant time, the barge was empty and had a draft of about 2 to 3 feet at the bow and 4 to 4½ feet at the stern where its skegs (fixed rudders for directional stability) are located.

On November 23, 1990, the empty barge in "hip-tow" of the CAPTAIN DANN (the tug was made up to the barge's port quarter) under the command of Captain Gossett, left New Haven, Connecticut destined for the Exxon terminal in Bayway, New Jersey (just south of the Goethals Bridge). Shortly after midnight, at 0100 hours on November 24, 1990, Gossett arrived at Exxon only to learn that an open berth at the terminal would become available in about one-half hour later. Gossett remained nearby the terminal waiting to berth. As it developed, after waiting in the river for one-half hour, a berth still did not become available and Gossett continued to wait. At 0215/0230 hours, Gossett went off duty and was relieved by Mate Loflin. At that point in time, Loflin assumed command of the tug, which he operated from the fully equipped lower pilothouse, as had Gossett in making the theretofore uneventful trip from New Haven to Exxon, Bayway, New Jersey.

When Loflin relieved Gossett and assumed operation of the tug, the flotilla lay perpendicular to the river—in an east-west direction—and according to Loflin (who was on duty at the time), the bow had already beached on the Staten Island bank of the river. Before Loflin took command finding the flotilla in the perpendicular position, Gossett had not posted a lookout on either CAPTAIN DANN or the barge, and as previously noted, Gossett operated the tug from the lower rather than upper pilothouse. There is no evidence that after assuming duty from Gossett, Loflin posted a lookout on either the tug or barge.

At approximately 0230 hours on November 24, 1990, Loflin backed the flotilla away from the Staten Island bank westerly across the river (toward New Jersey), then came ahead and to the left thus turning the flotilla with bow facing north into the ebbing tide, which kept the flotilla from drifting further south. Loflin was then still near the Staten Island shore in shallow waters, well out of the main ship channel and in a designated pipeline area. The vicinity of the flotilla was minimally illuminated by the lights on the opposite shore at the Exxon refinery some distance away. On the Staten Island shore, there was no visible pipeline leading into the water, but the pipeline crossing area was clearly indicated on the navigation chart and concededly Loflin was advised by Gossett that the flotilla was in a pipeline area. Additionally, Loflin could see Texas Eastern's warning signs on the shore regarding not anchoring or dredging.

At approximately 0250 hours on the morning of November 24, 1990, after Loflin had backed away from the Staten Island bank and turned, putting the flotilla parallel with the river and "stemming the tide," as described *supra*, the barge's position in the river was approximately fifteen to twenty

feet off the bank and in waters approximately 4½ feet in depth. Also, as noted above, the area was poorly illuminated. At such point in time and position in the river, Mate Loflin felt a bump concurrent with a metallic sounding noise (*i.e.*, like metal hitting against metal), and a spout of water was observed on the surface of the river, indicative that a natural gas pipeline had been ruptured. The court finds that the barge, drawing 4½ feet at the stern, and plaintiff's pipeline, which at that location and at that point in time was below approximately 4½ feet of water but exposed above the riverbed, came into contact tearing a small hole near the top of the pipeline.

As a result of the allision, the pipeline was not flattened, the barge was not damaged, and neither the barge nor tug was stranded or grounded *at the time or location of the allision.* The court further finds from a preponderance of credible evidence, including documentary evidence generated by plaintiff's employees, that *the pipeline at the point of contact and at the time of the allision was exposed above the riverbed and not covered with rip rap.*

About two weeks after the allision, on December 9, 1990, engineers P & O performed their bottom survey of the pipeline for the full width of the river and recorded the findings on a drawing bearing the identification "P & O File No. D26–1501–23" and dated December 14, 1990 (Exh. 16). After the December 1990 bottom survey was completed, Texas Eastern's Area Superintendent, J.W. Roberts, forwarded the survey results with a narrative report to his immediate superior, Roy Hartstein, Technical Operations Superintendent at Texas Eastern's Division office in Harrisburg, Pennsylvania.

Of particular pertinence to the problem of "insufficient" or "questionable" cover of the pipeline at the allision site at time of the allision due to recurrent erosion, and thus plaintiff's duty to continually monitor such erosion of cover, the Roberts memorandum recites: [2]

*Line # 1–R Arthur Kill River Crossing has insufficient or questionable cover* at the following locations (survey stations per those shown on attached Pyburn & Odum survey, D26–1501–23).

\*    \*    \*    \*    \*    \*

SS 17 + 20 to 21 + 65—Section where 20″ of *exposed pipe* was hit and punctured by a tugboat/barge on November 24, 1990. \* \* \*. *[T]he river current, heavy tidal action and barge wakes will likely erode the cover again.*

Exh. C (emphasis added.)

Roberts further admonished Hartstein as to the critical importance of maintaining adequate cover at the particular site due to presence of heavy barge traffic in the sections identified and as to the high degree of exposure of its pipeline to third party damage in those exposed sections:

The Arthur Kill River is a navigable waterway with large heavy barge traffic. *Consequently, the sections identified are highly subject to third party damage if not adequately covered,* as was the case on *November 24, 1990 when 16″ Line 1–R was hit and punctured by a tugboat/barge.* Naturally, the primary concern with third party damage is the hazard it presents to the public.

Exhibit C (emphasis added).

To summarize, following the P & O survey and his investigation following the CAPTAIN DANN incident, Roberts, the Area Superintendent immediately responsible for proper maintenance of the pipeline, and whom Texas Eastern would logically hold accountable for preventing accidents due to an exposed pipeline, took pains to point out the recurring erosion problem and plaintiff's duty to maintain adequate cover to prevent third party damage.

The P & O survey findings on January 27, 1992, placed on their drawing dated February 7, 1992 (Exh. F), confirmed Roberts' assessment of recurring erosion, as alluded

**2.** At trial, admissibility of Roberts' memo was, properly, objected to under FRE 407 insofar it relates to the taking of subsequent remedial measures (subsequent to the allision). Accordingly, the memo was received and has been considered in the court's decision only for the purpose of demonstrating the condition at the site of recurrent erosion, and concomitantly, a duty to monitor the pipeline's cover, which at the time of the allision was a preexisting condition and duty.

to in his report to Hartstein. Indeed, it should not have come as a surprise to Texas Eastern that in 1992 their engineers again found the rip rap eroded in the vicinity where the CAPTAIN DANN incident occurred.

Under all the facts and circumstances, Texas Eastern's attempt in its reply memorandum, p. 6, to discredit the Roberts' prescient memo as well as similar admonitions by plaintiff's other employees (exhibits E and P) as mere "exaggeration" of the severity of the erosion problem at the allision site is indeed quite astonishing.

Following the allision, an April 28, 1993 request by Zakaria M. Ebeid, Manager, Environmental Protection for Texas Eastern to the ACOE to perform maintenance work over the pipeline in the vicinity of the CAPTAIN DANN incident also underscores the long-standing preexisting (prior to the allision) erosion problem making the exposed section of pipeline highly subject to third party damage:

> Since 1950 significant erosion has occurred along both banks of the river crossing due to river current, heavy tidal action, and wakes from heavy barge traffic. *The pipeline is highly subject to third party damage if not adequately covered, as was the case on November 24, 1990 when the Line 1–R was hit and punctured by a tugboat/barge.* * * * Naturally, the primary concern with third party damage is the hazard it presents to the public.

Exh. E (emphasis added).

In sum, the record establishes that in the area of plaintiff's pipeline where the allision occurred there had been for an indeterminate period of time commencing sometime prior to the 1974 survey a hazardous continual erosion of the pipeline's cover protection in an area of or near heavy barge traffic, known to plaintiff from its surveys *prior to 1990, but negligently monitored*, which erosion exposed the pipeline to third party damage, as ultimately occurred in this case.

### *DISCUSSION AND CONCLUSIONS OF LAW*

#### I.

■ Texas Eastern contends that defendants violated two rules promulgated under the Inland Navigational Rules Act of 1980, 33 U.S.C. § 2001, *et seq.* ("INR")—Rules 2 and 5. Specifically, plaintiff alleges that Dann posted no lookout and operated its tug, which had an upper pilothouse, from the lower pilothouse in violation of INR 2 and 5. In that regard, plaintiff urges that the court invoke the "Pennsylvania Rule" which makes defendants' statutory violations presumptively the sole cause and fault of the allision, placing the burden on defendants to rebut such presumption by showing that the alleged violations could not have caused or contributed to the allision. *The Pennsylvania*, 86 U.S. 125, 22 L.Ed. 148 (1874). *See Orange Beach Water, Sewer and Fire Protection Auth. v. M/V Alva*, 680 F.2d 1374 (11th Cir.1982); *First Natl. Bk. v. Material Service*, 597 F.2d 1110 (7th Cir.1979); *Chicago and Western Indiana Railroad Co. v. Motorship BUKO MARU*, 505 F.2d 579 (7th Cir.1974).

The court agrees with plaintiff that under all the facts and circumstances defendants violated Rules 2 and 5, but nonetheless also agrees with defendants that failure to post a lookout and operating the tug from the lower pilothouse (the alleged Rule violations) could not have either caused or contributed to the allision. Therefore, the court concludes that defendants have rebutted the presumption of fault under the Pennsylvania Rule.

INR furnishes mariners with well-established steering and sailing rules and principles governing navigation on inland waters. *Kernan v. American Dredging Co.*, 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958). Plaintiff claims that since, at the time of the allision, defendants were navigating in shallow waters near the river bank in a known pipeline area, operation of the tug by Mate Loflin from the lower rather than upper pilothouse was a violation of INR 2, 33 U.S.C. § 2002 (commonly known as the General Prudential Rule); and that failure to station a lookout on the tug and/or deck of the barge was a violation of INR 5, 33 U.S.C. § 2005.

■ Rule 2 codifies a general duty all vessels owe each other to avoid collision. *Diesel Tanker Ira S. Bushey, Inc. v. Tug Bruce A. McAllister*, 1995 AMC 806, 1994

WL 320328 (S.D.N.Y.1994), citing *The Cutler*, 58 F.Supp. 864 (S.D.N.Y.1944), *aff'd*, 147 F.2d 545 (2d Cir.1945) and other cases. The standard of conduct imposed by INR 2 is that of reasonable care under the circumstances, the same standard as required under common law principles of negligence. *Diesel Tanker, supra.*

■ The court finds that reasonable care under the special circumstances in this case required that a tug, such as the CAPTAIN DANN, having upper and lower pilothouses, be navigated from the pilothouse having the better navigational equipment for the prevailing conditions and/or the better view, as the circumstances at the time warrant. The special circumstances immediately prior to the allision were: the barge was being towed along the starboard side without a lookout on either the tug or the deck of the barge; despite the lighting from the Exxon facility across the river, at night illumination near the Staten Island shore across the river, and hence visibility, was poor; the flotilla was very close to shore in shallow water after backing and turning and had already beached on the river bank. Under these circumstances, the court must agree with plaintiff's contention, based on the testimony of its well-qualified witness Captain Douglas Brown, ship docking pilot with the Metropolitan Pilot's Association, that from the upper pilothouse there would have been a significantly better view of *the shoreline* over the barge *to avoid beaching or grounding on the river bank or a collision with stationary visible objects in the area.* INR 5, requiring the posting of a proper lookout, is self-explanatory and requires no interpretation in this case.

■ However, the superior view from the upper pilothouse (or stationing of lookouts) for purposes of avoiding grounding the barge or tug on the riverbank or alliding with a visible object, would have been totally ineffective under the circumstances of this case in avoiding the allision with plaintiff's submerged pipeline, *which would not have been visible from a vessel at 0250 hours in the morning.* A lookout's failure to see an underwater obstruction is not negligence. *See American Zinc Co. v. Foster,* 313 F.Supp.

671 (S.D.Miss.1970); *M/S Bell Dan,* 1967 A.M.C. 2295, 2304 (1967); *Cumberland County Utilities Auth. v. M/T Delbar,* 604 F.Supp. 383 (D.N.J.1985). Accordingly, to reiterate, under the circumstances, Dann's failure to post lookouts or operate its tug from the upper pilothouse could not have either caused or contributed to the allision with plaintiff's pipeline.

## II.

■ The court next addresses plaintiff's contention that defendants should also be found liable for damaging plaintiff's pipeline under the well-settled admiralty rule that a moving vessel that strikes a known or visible fixed object is presumptively at fault. *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); *Self Towing, Inc. v. Brown Marine Services, Inc.,* 837 F.2d 1501 (11th Cir. 1988); *Mount Washington Tanker Co. v. Wahyuen Shipping, Inc.,* 833 F.2d 1541 (11th Cir.1987); *Brown and Root Marine Operators, Inc. v. Zapata Off–Shore Co.,* 377 F.2d 724 (5th Cir.1967); *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500 (5th Cir.1994); *A.T. & T. v. Steuart Transp.,* 1978 A.M.C. 1680 (D.Md.1977). Again, such presumption places the burden of proof on a defendant to show absence of fault causing or contributing to plaintiff's damage.

■ The party relying on the presumption must prove that the object was either visible or there was knowledge of the otherwise nonvisible object. *Delta Transload, Inc. v. M/V NAVIOS COMMANDER,* 818 F.2d 445, 450 (5th Cir.1987). The moving vessel may rebut the presumption by showing that it acted with reasonable care, that the allision was the fault of the stationary object, or that the allision was an unavoidable accident. *Bunge Corp. v. M/V Furness Bridge,* 558 F.2d 790 (5th Cir.1977).

■ The court agrees with Dann that the presumption is inapplicable under the facts of this case. Here, when the barge beached (prior to the allision), defendants did not damage a visible on-shore pipeline lead-

ing into the water,[3] or even allide with a visible or known submerged pipeline. Mariners have a right, absent knowledge or notice to the contrary, to assume that the submerged pipeline was buried or adequately covered. *In Re F/V Gulf King 55,* 1995 A.M.C. 232, 1994 WL 321042 (E.D.La.1994); *Delta Transload, Inc. v. M/V Navios Commander,* 818 F.2d 445 (5th Cir.1987); *Pelican Marine Carriers, Inc. v. City of Tampa,* 791 F.Supp. 845 (M.D.Fl.1992).

The evidence establishes that Arthur Kill is a navigable river shore to shore; that prior to the allision, Dann's flotilla was waiting to berth at Exxon Bayway terminal in lawfully navigable waters outside the project channel and main river traffic, although in waters of shallow depth and in a designated pipeline area; that at *the time of allision,* the flotilla was not grounded or stranded on either the river bank or river bottom; that the pipeline at the point of contact was completely submerged and not visible to mariners, and therefore, the barge did not allide with a known or visible pipeline; and more, that the pipeline itself was at fault since in violation of its permit and statutory obligations, the pipeline was exposed which, *according to plaintiff's own documentation, made its pipeline in the vicinity of navigable waters highly subject to third party damage.* Clearly, the presumption of fault relied on by plaintiff is inapposite on the facts of this case.

### III.

■ Citing *A.T. & T. v. Steuart Transp., supra,* and *Philadelphia Elec. Co. v. Curtis Bay Towing Co. of Pa.,* 260 F.Supp. 505 (E.D.Pa.1966), Texas Eastern further contends that even aside from defendants' presumptive liability based on INR violations and striking a fixed object, as discussed *supra,* navigating in, and maneuvering the flotilla outside, the main channel in shallow waters near shore in a known pipeline area, absent any navigational necessity, constituted negligence on the part of defendants and the sole proximate cause of the allision.

Although the evidence shows that mariners transiting the Arthur Kill enroute from point to point normally navigate their vessels within the federal project channel, which has a minimum depth of thirty-five feet, Arthur Kill is navigable bank to bank. Further, turning vessels longer than the width of the project channel are commonly seen outside the ship channel. Dann's explanation for being outside the project channel in close proximity to the Staten Island shore at the time of the allision is that it was waiting to berth at Exxon and had been delayed in doing so.

In any event, whether or not under all the facts and circumstances it was imprudent for defendants to navigate and maneuver as occurred in the shallow waters near the shoreline, in the vicinity of the allision at the time in question, fundamentally defendants incur liability for negligence only if plaintiff's damage falls within the scope of the reasonably foreseeable risks posed by defendants' imprudent conduct.

■ The scope of reasonably foreseeable risks to a mariner maneuvering in navigable waters of shallow depth near the river bank, even in a designated pipeline area, include, of course, hitting a known, marked or visible pipeline, or grounding or stranding on either the river bottom or river bank; but not a foreseeable risk of hitting—as in this case—a submerged exposed pipeline above the riverbed, unmarked and unknown, and constituting an unlawful obstruction to navigation.

■ A sign on shore warning of a pipeline area and stating, "DO NOT ANCHOR OR DREDGE," does not change this result. *Ranger Ins. Co. v. Exxon Pipeline Co.,* 760 F.Supp. 97 (W.D.La.1990); *Tidewater Marine v. Curran–Houston,* 1984 A.M.C. 2760, 1983 WL 704 (E.D.La.1983); *Peoples Nat. Gas Co. v. Ashland Oil,* 604 F.Supp. 1517 (W.D.Pa.1985); *Plantation Pipe Line Co. v. Findlay Towing Co.,* 1977 A.M.C. 2553 (S.D.Ala.1977). Defendants were neither

---

**3.** Indeed, Captain Gossett changed his deposition to point up that the pipeline leading into the water on the New Jersey side, not the Staten Island side, was visible. While there can be no doubt that Gossett and Loflin were aware that the flotilla was in a pipeline area at the time of the allision, they had no knowledge or notice of defendant's exposed pipeline above the riverbed near the Staten Island shore.

dredging nor dropping anchor. Hence, plaintiff's reliance on its on-shore warning signs against dredging and dropping anchor is misplaced as appropriate notice of the existence of a non-buried above-the-riverbed exposed pipeline. Mariners can reasonably expect that in a navigable pipeline area, pipelines are buried unless otherwise charted or marked. *Peoples Natural Gas; Plantation Pipe Line Co.; Tidewater Marine v. Curran–Houston.* Moreover, warnings against dredging and anchoring are intended to prevent damage to buried pipeline by penetration of the riverbed by an anchor or other equipment, and are not intended to warn mariners against obstructions to navigation by reason of inadequately covered or exposed pipeline on the river bottom. Clearly, the shoreline signs did not warn against the latter, and the allision did not occur due to defendants' anchoring or dredging or other disregard of plaintiff's warning notices. *Peoples Natural Gas; Plantation Pipe Line Co.; Tidewater Marine v. Curran–Houston* ("Those who ply the waters of well-travelled navigable streams * * * have a right to assume the pipeline is buried below the lake. [Plaintiff] cannot discharge its duty to avoid collisions with pipelines merely by posting signs warning of pipeline's presence."); *Ranger Insurance Co., supra.*

Dann's knowledge that the flotilla was in a pipeline area is not notice of an exposed or inadequately covered pipeline laying on the riverbed. *Peoples Natural Gas.* Absent notice by chart, buoy or otherwise that an otherwise buried pipeline has become exposed and an obstruction to navigation, navigating a vessel in a pipeline area, in and of itself, presents no reasonably foreseeable risk of damaging the pipeline and thus does not constitute negligence. *See In Re F/V Gulf King; Peoples Natural Gas, Tidewater Marine, Plantation Pipe Line Co.*

While defendants' navigation expert Frank Cowan conceded there is a always a possibility that a large skeg of a barge could go into a number of feet of *soft mud river bottom*, a mariner would normally "have to dig four to six feet into that bank to hit it [buried pipeline]." Tr. 655–656. Cowan, however, knew of no instances of where the foregoing ever

actually occurred. *Id.* The court finds that the barge did *not* ground penetrating adequate stone rip rap cover over the pipeline before contacting it, as suggested by plaintiff.

Moreover, while plaintiff repeatedly stresses that the barge had "beached" on the Staten Island river bank, plaintiff concedes such event occurred prior to, and not at the time of, the allision. Plft's mem. at 39. Hence, any imprudence or error of judgment by Dann in unsafely navigating the flotilla and beaching prior to the allision, obviously was not the proximate cause of the damage to plaintiff's exposed pipeline.

In view of the foregoing, there was no correlative duty of care by defendants owing to plaintiff respecting the submerged exposed pipeline of which defendants had no notice or knowledge. As stated in *Peoples Natural Gas:*

Moreover Captain Dent did not know nor should have known that Peoples' pipeline was uncovered and sitting on top of the riverbed. The Third Circuit has held that non-liability for unforeseeable results is a rule limiting the scope of duty, not a rule of causation. * * * Peoples attempts to buttress their notice argument by asserting that in addition to the pipeline being marked on navigation charts, its location is clearly indicated by billboard signs on the river banks and that the towboat's crew could have used weights or depth gauges to determine the depth of the river close to the shore. These arguments are equally unpersuasive.

*Like the charts in Diamond State [205 F.2d 402 (3d Cir.1953)], the navigation charts and billboard signs in this case only served notice that the pipeline crosses the river at a given point. Neither medium indicated that the pipeline sat uncovered on top of the riverbed.* * * * There is no dispute in the evidence that Captain Dent knew that a pipeline crossed the river, but relying on common sense and years of nautical experience, Dent expected the line to be submerged below the riverbed. Accordingly, *the pilot's duty to the pipeline is to be determined by what he knew or should have known at the time, not by what we now know in hindsight.*

*In this case Captain Dent could not have foreseen that Peoples' pipeline sat uncovered on the riverbed and therefore had no duty of due care to the exposed pipeline.*

604 F.Supp. at 1526–27 (emphasis added).

Consequently, knowledge by Dann that the flotilla was in a pipeline area was not actual or constructive notice that the pipeline was above the riverbed *and* exposed, and hence an obstruction to navigation. *Id.* Defendants, therefore, could navigate with a reasonable expectation that pipelines across navigable rivers are buried below the seabed, bank to bank, absent notice to the contrary. *Plantation Pipe Line Co.; M/V Alva; Peoples Natural Gas; Tidewater Marine; Ranger Ins. Co.* Under the circumstances of this case, Dann could not have reasonably foreseen, and thus have avoided, the allision with Texas Eastern's exposed underwater pipeline which Dann reasonably could have expected to be buried below the seabed. *Ranger Ins. Co. v. Exxon Pipeline Co.,* 760 F.Supp. 97 (W.D.La.1990); *Peoples Natural Gas; Plantation Pipe Line Co.; Tidewater Marine v. Curran–Houston,* 1984 A.M.C. 2760 (E.D.La.1983).

Fundamentally, of course, absent any duty of defendants to plaintiff relative to its exposed pipeline under the circumstances of this case, defendants are not liable to plaintiff for a breach thereof, and thus is not liable for negligence. *Prosser & Keeton on Torts,* Ch. 6, § 37 (5th Ed.1984).

## IV.

■ The court now turns to defendants' contention that the sole proximate cause of the allision and plaintiff's damage was plaintiff's own negligence in failing to maintain adequate cover over the pipeline with stone "rip rap" in compliance with plaintiff's obligations under its 1976 ACOE permit and pertinent statutory authority; and in failing to prevent its pipeline from becoming an obstruction to lawful navigation. The court agrees.

Plaintiff stresses that its pipeline installation in the early 1950s was accepted by ACOE "as built" based on survey drawings submitted following the installation; that al-though following the 1975 repair work on the pipeline near the Staten Island shore under ACOE's Letter of Permission for such work, the pipeline was then at a higher elevation than was initially authorized, ACOE accepted and approved plaintiff's subsequently submitted "as built" drawings depicting the rip rap cover work actually done; that the pipeline at the point of contact with the barge was adequately covered with rip rap on the date of the allision; that the shallow waters in the vicinity of the allision were not navigable and prudent mariners when transiting this area of the Arthur Kill remain within the project channel; and that despite the adequate cover placed over the pipeline sometime after 1985 and still remaining in place in 1990, the barge negligently grounded on such cover hitting the pipeline and rupturing it.

Plaintiff further insists that the "preponderance of evidence" demonstrates that the allision site was properly covered at the time of the allision predicated on: P & O's December 1990 survey findings of rip rap cover over the pipeline just west of the construction site (plft's exh. 17); testimony that the pipeline was "mounded up" with rip rap east of the allision site a few days after the incident; and testimony that the barge "raised up" at the time of the allision.

Defendants, on the other hand, posit: plaintiff breached the conditions of its permits that cover over the pipeline be maintained at all times and its statutory duty to avoid obstructions to navigation by failure to maintain sufficient cover over the pipeline in the area of the allision, citing *M/V Alva, Peoples Natural Gas Co. and Corby v. Ramsdell,* 48 F.2d 701 (2d Cir.1931). Moreover, defendants maintain that the duty not to create an obstruction to navigation extends to the entire width of a navigable waterway from bank to bank and is not limited to a dredged channel, citing *M/V Alva; Peoples Natural Gas;* and *Plantation Pipe Line Co.* See also 33 C.F.R. § 209.260 (1950) and 33 C.F.R. § 209.120(d) (1975).

The court does not find the "circumstantial evidence" and inferences that may be drawn therefrom relied on by plaintiff sufficiently persuasive to determine by a preponderance of the evidence that the pipeline in the vicini-

ty of the CAPTAIN DANN incident was covered at the time of the allision. In light of the well documented, indeed irrefutable, evidence of recurrent erosion of the rip rap cover and the prior flattening of the pipeline in the very same area as the CAPTAIN DANN incident, the court concludes that whether or not the pipeline in such area had been adequately re-covered with rip rap subsequent to 1984 (when the pipeline was found exposed for the second time through a bottom survey), due to recurrence of erosion the pipeline again was exposed above the riverbed at the time of the allision.

■■■ Under the statutory and regulatory authority for the initial installation of the R1 pipeline under the 1950 permit and under the terms and conditions of the 1975 permit, plaintiff assumed a number of duties, most importantly here a duty to avoid creating an unauthorized obstruction to navigation on the Arthur Kill. *See* 33 U.S.C. § 403; 33 C.F.R. § 209.130 (1950); 33 C.F.R. § 209.120 (1975). As pointed up by defendants, the statutory duty is breached where a structure not initially an obstruction to navigation becomes one because of improper maintenance. *Orange Beach Water, Sewer and Fire Protection Authority, supra; Peoples Natural Gas Co., supra; Corby v. Ramsdell,* 48 F.2d 701 (2d Cir.1931).

The record, especially evidence of the history of the erosion of cover over the pipeline in the area of the CAPTAIN DANN incident as described by the testimony, and by extensive documentary proof generated by Texas Eastern's own officials concerned with the problem of the condition of the pipeline at the time of the allision, compels the conclusion that at the time of the allision the pipeline at the point of contact was exposed due to the recurrence of erosion. Plaintiff clearly knew that erosion was recurrent in the vicinity, but negligently failed to properly monitor such erosion and maintain cover. Therefore, counsel for defendants are quite correct in claiming that Texas Eastern was in violation of its permit and applicable statutes and regulations: River and Harbor Act, and as to the segment of pipeline replaced in 1975, the Natural Gas Pipeline Safety Act of 1968 and its regulations effective in 1970, 49 C.F.R.

Part 192, § 92.317(a); § 192.327(a); § 192.605(c) and § 192.613(a) (1970).

### SUMMARY AND CONCLUSION

In the course of performing the P & O bottom survey in 1974, plaintiff discovered, so far as relevant to this case, that its pipeline in the vicinity of the CAPTAIN DANN incident was exposed above the riverbed and indeed was even flattened. Remedial steps were taken pursuant to a 1975 ACOE Letter of Permission to replace and recover thirty to forty feet of pipeline where the cover had eroded and damage to the pipeline itself had occurred. Plaintiff re-covered the pipeline in the area with two feet of stone "rip rap" in accordance with the 1975 ACOE Letter of Permission, which required *inter alia,* that such cover be maintained over the pipeline.

The 1984 P & O bottom survey revealed erosion of cover again had occurred, exposing the pipeline above the riverbed in the very same vicinity as the replaced and re-covered segment of pipeline and the later CAPTAIN DANN incident. Accordingly, by 1985 plaintiff was unquestionably on actual notice of a *propensity for recurrent erosion* of the pipeline's cover at the vicinity of the CAPTAIN DANN incident. Notwithstanding the foregoing, no follow-up bottom survey or diving survey was performed for some five years until after the November 24, 1990 allision, and plaintiff mistakenly relied only on perfunctory vehicular inspections to detect further erosion of cover over the submerged pipeline.

■■■ Plaintiff was grossly negligent in relying solely on vehicular patrols as a proper inspection procedure to monitor whether or not the submerged pipeline remained adequately covered in compliance with the permits and pertinent statutes and regulations. *Cf. Ranger Insurance Co. v. Exxon Pipeline Co.,* 760 F.Supp. 97 (W.D.La.1990) (visual inspection of pipeline from highway inadequate). Although by 1985 plaintiff was on actual notice of the propensity for recurrent erosion of cover in the vicinity of the CAPTAIN DANN incident, and a prior casualty in the same vicinity, from 1985 to the date of the allision, plaintiff was negligent in failing to exercise reasonable care to properly moni-

tor the cover over its pipeline in that area so as to maintain adequate cover.

In view of the foregoing and the above cited authorities, plainly defendants have rebutted the presumption of fault; and plaintiff has breached critical statutory and permit obligations by failing to maintain adequate cover over the pipeline as represented in the ACOE permit application. The proximate cause of the allision and damage to the pipeline was solely plaintiff's own neglect and lack of due diligence, notwithstanding Dann's INR violations and navigation outside the project channel, which events were not the proximate cause of the allision or plaintiff's damage.

The short of the matter is that plaintiff's exposed pipeline above the riverbed was in navigable waters carrying heavy barge traffic making the pipeline highly subject to third party damage, an unlawful obstruction to navigation, and bluntly, an "accident waiting to happen."

For the foregoing reasons, the complaint is dismissed, and the Clerk is directed to enter judgment accordingly.