**OPTICAL COMMUNICATIONS GROUP, INC., Plaintiff,**

v.

**M/V AMBASSADOR, its engines, boilers, furniture, tackle apparel, etc., in rem and Marbulk Canada, Inc., in personam, Defendants.**

**No. 11 Civ. 4439(NRB).**

United States District Court, S.D. New York.

March 29, 2013.

Michael E. Stern, Esq., Rubin, Fiorella & Friedman LLP, New York, NY, for Plaintiff.

Richard V. Singleton, Esq., Alan M. Weigel, Esq., Blank Rome LLP, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff Optical Communications Group, Inc. ("OCG" or "plaintiff") filed this admi-

ralty and maritime action against cargo vessel M/V AMBASSADOR (the "Vessel") and its owner, Marbulk Canada Inc. (collectively, "defendants"), after the Vessel's anchor struck and damaged plaintiff's fiber optic submarine telecommunications cable. We have jurisdiction over this matter pursuant to 28 U.S.C. § 1333.

In the motion before the Court, defendants seek (i) summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Rule 56") and (ii) an award of sanctions pursuant to Rule 11(b) of the Federal Rules of Civil Procedure ("Rule 11(b)") and/or 28 U.S.C. § 1927 ("Section 1927"). For the reasons set forth below, we grant defendants' motion for summary judgment and deny their motion for sanctions.

## BACKGROUND[1]

### I. *Introduction*

The Vessel is a self-discharging bulk carrier that is approximately 730 feet in length. Khrypunov Decl. ¶ 3. On April 11, 2010, the Vessel traveled south from the GMD Docks in Brooklyn, New York, intending to anchor in Gravesend Bay. *Id.* ¶ 4. After the Vessel passed under the Verrazano–Narrows Bridge, its port anchor prematurely deployed, dropping approximately 55 feet from the surface of the water to the seafloor. *Id.* ¶¶ 8, 15, Ex. 2.

There, the anchor struck and damaged plaintiff's submarine fiber optic cable, which ran in an east/west direction between Brooklyn and Staten Island. *Id.* ¶ 10; Singleton Aff. Ex. D (hereinafter "Sherry Dep.") at 23:13–20. Plaintiff now seeks approximately $3,500,000 in damages. Compl. ¶¶ 24, 29.

In support of the instant motion for summary judgment and for sanctions, defendants contend that the Vessel and OCG cannot be held liable as a matter of law because (i) plaintiff laid the fiber optic cable outside the designated cable area in violation of OCG's permit from the U.S. Army Corps of Engineers ("ACE") and (ii) the Vessel dropped its anchor outside of the designated cable area and inside a navigation channel. Ultimately, we need only address the second claim. Nonetheless, we explore the facts and evidence underlying both issues to contextualize the parties' dispute.

### II. *The Installation of Plaintiff's Cable*

#### A. **Plaintiff's permit request**

On or around October 3, 2006, Brad Ickes ("Ickes"), the President of OCG, submitted a revised application to ACE and the New York State Department of Environmental Conservation ("NYDEC") for permission to install a 12,500 foot-long

---

1. This background is derived from the Verified Complaint ("Compl."), filed June 29, 2011; Defendants' Local Rule 56.1 Statement ("Defs.' R. 56.1"), filed August 9, 2012; the Affidavit of Richard V. Singleton ("Singleton Aff."), filed August 9, 2012, and the exhibits annexed thereto; the Declaration of Volodymyr Khrypunov ("Khrypunov Decl."), filed August 9, 2012, and the exhibits annexed thereto; Plaintiff's Response to Defendants' Local Rule 56.1 Statement ("Plf.'s R. 56.1"), filed September 21, 2012; the Declaration of Michael S. Stern ("Stern Decl."), filed September 21, 2012, and the exhibits annexed thereto; the Declaration of H. Arnold Carr ("Carr Decl."), filed September 21, 2012, and the exhibits annexed thereto; the Declaration of Alan Blume ("Blume Decl."), filed September 21, 2012, and the exhibit annexed thereto; and the Declaration of Brad Ickes ("Ickes Decl."), filed September 21, 2012, and the exhibits annexed thereto. We note that Plaintiff's Response to Defendants' Local Rule 56.1 Statement is replete with legal arguments and statements that are unsubstantiated by citations to the record. Accordingly, we have undertaken "an assiduous review of the record" to determine whether material facts are in dispute. *Spiegel v. Schulmann,* 604 F.3d 72, 83 (2d Cir.2010) (internal quotation marks omitted).

submarine fiber optic cable between Brooklyn and Staten Island. Ickes Decl. ¶¶ 1, 5; Singleton Aff. Ex. A at 1. In the revised application, Ickes represented that plaintiff would lay the cable "outside of the anchorage areas" and within "an existing cable crossing area" that ran in an east/west direction under the Verrazano–Narrows Bridge. Singleton Aff. Ex. A at 1.

A diagram attached to plaintiff's application depicted the proposed cable line running south of the Verrazano–Narrows Bridge in an existing charted cable field. Singleton Aff. Ex. A at Fig. No. 1. As demonstrated below, the diagram showed the cable running north along the Brooklyn shoreline, west across the Verazzano Narrows, and south along Staten Island:

Singleton Aff. Ex. A at Fig. No. 1.[2] On December 8, 2006, ACE approved plaintiff's application. Ickes Decl. ¶ 4, Ex. 1.

### B. The laying of plaintiff's cable

After receiving the appropriate permit, Ickes retained Mark Sherry ("Sherry") to install the cable on the seafloor. Ickes Decl. ¶ 6; *see also* Plf.'s R. 56.1 ¶ 7 (noting that Sherry "was responsible for laying the cable in the water"). Using a vessel called the M/V CABLE QUEEN (the "Cable Laying Boat"), Sherry and a small crew installed the cable between Brooklyn and Staten Island on January 12, 2007. Sher-

ry Dep. 64:9–22. Ickes was not present on the Cable Laying Boat at the time the cable was laid. Ickes Decl. ¶ 6. Instead, he supervised the work ashore. *Id.*

The parties disagree as to where, exactly, Sherry and the Cable Laying Boat positioned plaintiff's cable. *See* Defs.' R. 56.1 ¶ 9; Plf.'s R. 56.1 ¶ 9. According to defendants, Sherry installed the cable "almost entirely outside of the cable area in a direct line from its terminus on the Brooklyn side to its terminus on the Staten Island side." Defs.' R. 56.1 ¶ 9. In other words, defendants maintain that the cable did *not* run north along Brooklyn, west

---

**2.** We have cropped the exhibits herein to exclude their non-essential components. To enhance the readability of the instant diagram, we have also (i) added the words "Verrazano–Narrows Bridge," "Proposed Cable Line,"

and "Cable Area" over their original demarcations and (ii) darkened the dashed line depicting the southernmost boundary of the cable field.

along the Verazanno–Narrows Bridge, and south along Staten Island, as depicted *supra*, but rather in a straight line from Brooklyn to Staten Island. *Id.*

In support of this position, defendants offer the testimony of Sherry, whom defense counsel deposed on October 11, 2011.[3] Sherry Dep. 1. At his deposition, Sherry testified that the Cable Laying Boat traveled in an "A to B straight line" from Brooklyn to Staten Island, *id.* 48:18, because the crew was "concerned about the length of the available cable," *id.*

48:22–23.[4] Sherry further testified that the captain of the Cable Laying Boat, Stephen Moreau ("Captain Moreau"), *id.* 24:1–16, brought aboard "state-of-the-art" GPS equipment to track the Cable Laying Boat's position,[5] *id.* 47:21–48:4, and subsequently provided Sherry with a computer-generated diagram that confirmed the boat's path, *id.* 48:9–19, 82:17–21.

The diagram, copied below, shows a substantially straight line running between Brooklyn and Staten Island, with the majority of the line passing outside the marked cable field:

Singleton Aff. Ex. E. During his deposition, Sherry testified that the line represented the Cable Laying Boat's "track" and, thus, the location where the cable was installed. Sherry Dep. 47:10–48:19. Sherry said that he monitored the Cable Lay-

---

**3.** Ickes purchased Sherry's cable laying business, vessel, and land in 2004 or 2005, *see* Sherry Dep. 11:15–12:11, 20:1–8, and later employed Sherry to lay the cable at issue, *id.* 33:3–9. At the time of the deposition, Ickes owed Sherry approximately $750,000 for the land. *Id.* 33:10–19.

**4.** Sherry testified that the Cable Laying Boat was equipped with approximately "14,000 feet or less" of cable, *id.* 25:20–23, and that approximately 500 to 1,000 feet remained after the crew completed the installation, *id.* 30:21–25.

**5.** According to Sherry, Captain Moreau connected a laptop computer to a GPS antenna that the crew placed atop the Cable Laying Boat's wheelhouse. *Id.* 83:10–23. Sherry testified that he did not know the exact type of equipment Captain Moreau used or how it was calibrated. *Id.* 82:22–83:9, 83:21–25. Sherry further testified that Captain Moreau passed away prior to the commencement of this action. *Id.* 56:12–18.

ing Boat's internal GPS system as the crew performed its task, *id.* 48:5–8, and confirmed that the diagram was consistent with his contemporaneous observations, *id.* 48:9–19.

Plaintiff disputes Sherry's conclusion that the cable was installed outside the marked cable area. Plf.'s R. 56.1 ¶ 9. To demonstrate the existence of a genuine dispute concerning the cable's location, plaintiff offers a declaration from Ickes. Ickes states that, after the Cable Laying Boat laid the cable, Sherry showed him a laptop computer depicting "the actual track of the cable as positioned, including distances from the marked cable crossing demarcation lines on the nautical chart." Ickes Decl. ¶ 9. Ickes states that he contemporaneously recorded this information and prepared a handwritten chart, *id.*, as follows:

*Id.* Ex. 2. According to Ickes's chart, the Cable Laying Boat installed the cable approximately 310 to 400 feet north of the cable area boundary. *Id.*

To buttress this position, plaintiff offers a declaration from Arnold Carr ("Carr"), the President of American Underwater Search and Survey, Ltd., a company that specializes in underwater recovery services. Carr Decl. ¶ 1, In connection with efforts to locate and recover plaintiff's cable, Carr examined side scan sonar data from seafloor areas in and around the cable field. *Id.* ¶ 2. Carr provides the following diagram:

*Id.* Ex. 2. According to Carr, the sonar data indicates that the cable was positioned within the charted cable area, but was pulled south of the cable field when struck by the Vessel's anchor. *Id.* ¶ 5. Carr notes: "Even after the cable was dragged several hundred yards, the East–West laying cable remnants were north of the location suggested by" Captain Moreau's computer-generated diagram. *Id.* ¶ 10.

## C. Plaintiff's permit compliance certification

After the Cable Laying Boat installed the cable, Ickes submitted a Nationwide Permit Compliance Certification and Report Form to ACE and the National Oceanic and Atmospheric Administration ("NOAA"), the federal agency responsible for preparing and updating navigation charts. Ickes Decl. ¶¶ 11–12, Exs. 3–4. In his submission to NOAA, Ickes requested that the agency correct United States Chart No. 12402 ("Chart 12402") by accounting for a strip of cable that dipped south of the charted cable area boundary near the Staten Island shoreline. *See id.* Ex. 3 at 1, Figure No. 1; Singleton Aff. Ex. F at Chart 12402. However, Ickes did not notify NOAA of the larger deviations suggested by Captain Moreau's computer-generated diagram.[6] *See id.*

Ickes maintains that he asked NOAA to correct Chart 12402 in January 2008. Ickes Decl. ¶¶ 11–12; *see also id.* Ex. 3 at 1 (cover letter carrying a date of January 25, 2008). However, NOAA did not receive any correspondence from Ickes until November 2011, *i.e.*, well after plaintiff filed the instant action. *See* Singleton Aff. Ex. F at 1. Accordingly, it is undisputed that, at the time the allision occurred, Chart 12402 did not show any deviations or extensions to the marked cable field that were attributable to plaintiff's cable.

---

**6.** Indeed, plaintiff maintains that such deviations did not exist. *See* Plf.'s R. 56.1 ¶ 9.

## III. *The Allision*

On April 11, 2010, the Vessel departed from the GMD Docks, its officers navigating with Chart 12402. Khrypunov Decl. ¶ 4. The Vessel was equipped with a Simplified Vessel Data Radar ("SVDR"), *id.* ¶ 5, which defendants describe as "the maritime equivalent of a 'black box' for ships": it "records and stores data from the vessel's navigational equipment, including the ship's GPS," and "records sounds from microphones installed at various locations on the vessel's bridge," [7] Defs.' R. 56.1 ¶ 21; *see also* Khrypunov Decl. ¶ 6.

It is undisputed that, after the Vessel passed south under the Verrazano–Narrows Bridge, its port anchor deployed, descending to the seafloor and snagging plaintiff's cable. Khrypunov Decl. ¶¶ 8, 10. The parties disagree as to where the ship was positioned when the anchor began to fall. *See* Defs.' R. 56.1 ¶ 20; Plf.'s R. 56.1 ¶ 20. Defendants maintain that the anchor did not release until the bow of the Vessel had passed the southernmost boundary of the charted cable field. Defs.' R. 56.1 ¶ 20; *see also* Khrypunov Decl. f 8. In support of this position, defendants offer the declaration of Volodymyr Khrypunov ("Captain Khrypunov"), who was master of the Vessel when the incident occurred. Khrypunov Decl. ¶ 2. According to Captain Khrypunov, the Vessel was approximately 33 yards outside the marked cable field when it released its port anchor, *id.* ¶ 14, and an additional 17 yards outside the cable field when the anchor struck ground, *id.* ¶ 16.

To substantiate this claim, Captain Khrypunov states that he knew the moment the Vessel's port anchor deployed, because he heard the "immediate and unmistakable sound" of the anchor chain rattling through the hawse pipe. *Id.* ¶ 9. According to Captain Khrypunov, the SVDR recorded this "unmistakable sound" beginning at precisely 10:30:12 a.m. (*i.e.,* 10:30 a.m. and 12 seconds), at which time the SVDR logged the Vessel's position at 40°36.068N–74°02.698W and its speed at 6.1 knots. *Id.* ¶ 12; *see also id.* Ex. 1 (depicting the SVDR screenshot at 2:30:12 p.m. UTC, or 10:30:12 a.m. EST).

According to Captain Khrypunov, the position the SVDR recorded at 10:30:12 a.m. was actually the location of the Vessel's GPS antenna, which sits atop the Vessel's bridge, some 195 yards behind the anchor. *Id.* ¶ 14. To determine the exact position where the anchor released, Captain Khrypunov states that "it is necessary to add the distance from the GPS antenna to the anchor." *Id.* Captain Khrypunov notes: "When this is done, it shows the anchor was released at least 33 yards outside the southernmost boundary of the cable field." *Id.*

Captain Khrypunov states that, once the anchor deployed, it dropped approximately 20 feet to the water surface, and another 50 to 55 feet to the seafloor. *Id.* ¶ 15. Captain Khrypunov estimates that it would take approximately five seconds for the anchor to travel this distance. *Id.* ¶ 16. Given the Vessel's speed of 6.1 knots, Captain Khrypunov concludes that the Vessel was at least 50 yards outside the southernmost boundary of the marked cable area when the anchor struck ground.[8] *Id.*

---

7. Although plaintiff apparently disputes this description of an SVDR, *see id.* ¶ 21, plaintiff does not provide any controverting evidence as to the SVDR's function.

8. After the incident occurred, Captain Khrypunov prepared a Witness Statement Form at the request of the U.S. Coast Guard. Khrypunov Decl. ¶ 18; *see also id.* Ex. 2. In his written statement, Captain Khrypunov indicated that the Vessel released its port anchor at 40°35.8N–74°02.6W, which is south of the drop point indicated by the SVDR data and, thus, further away from the marked cable field. *Id.* ¶¶ 17–18, Ex. 2. In his declaration, Captain Khrypunov states that he culled these coordinates from a notation on the Vessel's navigation chart. *Id.* ¶¶ 17–18. The captain further states that he prepared the Witness Statement Form before reviewing the SDVR

Plaintiff challenges defendants' interpretation of the SVDR data. *See* Plf.'s R. 56.1 ¶ 24. To do so, plaintiff offers the declaration of Alan Blume ("Blume"), the Principal of Blume Maritime, a marine safety consulting firm. Blume Decl. ¶ 1. Blume states that "there are numerous variables which will effect when a sound is intercepted and recorded by the [voyage data recorder ('VDR')] system, including the direction and speed of the wind, speed and direction of the ship, humidity, sensitivity of the recording system and type of noise." *Id.* ¶ 5. Thus, Blume opines that "[a]nyone listening to a 'sound' recorded by the VDR cannot state precisely when the anchor was let go." *Id.* ¶ 6.

### IV. *Procedural History*

Plaintiff filed this action on June 29, 2011. Plaintiff's sole claim is that "[t]he damage to OCG's fiber optic submarine cable was proximately caused by" defendants' negligence, "with no negligence or culpable conduct on the part of OCG contributing to the damage." *See* Compl. ¶¶ 22, 27. Defendants moved for summary judgment on August 9, 2012, and briefing was completed on November 17, 2012.

### *DISCUSSION*

### I. *Summary Judgment Standard*

A motion for summary judgment is appropriately granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d

Cir.2007) (internal quotation marks omitted). When making this determination, "we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir.2012) (internal quotation marks omitted).

On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" *Fed. Deposit Ins. Co. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir.2010) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Where that burden is carried, the nonmoving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts and may not rely on conclusory allegations or unsubstantiated speculation." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir.2011) (internal quotation marks and citations omitted).

### II. *Analysis*

**A. There is no genuine dispute that the Vessel released its anchor beyond the southernmost boundary of the marked cable field and, thus, that plaintiff's cable was outside the charted cable area when struck**

▆▆▆ In ruling on a motion for summary judgment, a court will credit neither "speculative" assertions, *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir.2012), nor evi-

---

data, and that he "consider[s] the SVDR position to be more accurate." *Id.* ¶ 18. Defendants have not produced the navigation chart from which the alternative coordinates derive. *See* Stern Decl. Ex. 1 ¶ 14.

dence that is "blatantly contradicted by the record," *Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007). Applying those standards here, plaintiff has not produced any evidence that would allow a reasonable juror to conclude that the Vessel released its anchor inside the charted cable area.

We begin with the location of the Vessel itself. In his declaration, the master of the Vessel (*i.e.,* Captain Khrypunov), states that the SVDR recorded the "unmistakable sound" of the anchor chain rumbling down the hawse pipe at precisely 10:30:12 a.m., *see* Khrypunov Decl. ¶¶ 9, 12, at which time the GPS charted the Vessel's bow approximately 33 yards outside the marked cable field, *id.* ¶ 14; *see also supra* Section III. To demonstrate a genuine dispute with respect to these facts, plaintiff offers the declaration of Blume, a retired U.S. Coast Guard. Blume Decl. ¶ 1. However, Blume's declaration simply does not carry the weight that plaintiff ascribes to it.

In his declaration, Blume discusses various factors (*e.g.,* the direction and speed of the wind) that might have affected the SVDR's interception of sound, *id.* ¶ 5, thus preserving the theoretical possibility that the SVDR did not record the sound of the anchor chain rumbling down the hawse pipe until after it had already occurred. However, even assuming, *arguendo,* that Blume is qualified to opine on questions of acoustics,[9] he does not quantify how much of a delay any one factor caused, let alone how any of the factors support his speculative observation that the anchor was "most likely already in the water and falling to the bottom when the sound is first heard on the VDR microphone." *Id.* ¶ 4.

Having failed to discredit Captain Khrypunov's conclusions concerning the SVDR sound recording, Blume next seeks to impugn the accuracy of the GPS. To do so, Blume states that GPS units have a margin of error of 10 to 15 meters (*i.e.,* 10.9 to 16.4 yards). *Id.* ¶ 7. However, even if true, this fact is clearly immaterial: assuming the greatest margin of error applied, the Vessel would still be 16.6 yards outside the marked cable field when its port anchor deployed.[10] In an effort to mask this reality, Blume notes that there "may" have been an even greater margin of error here, because the Vessel's GPS units were "improperly spliced to a connection with a single antenna." *Id.* ¶ 8. Blume states that the splice "could *potentially* lead to reduced signal and reduced accuracy," *id.* (emphasis added), but he does state, let alone substantiate, that a reduction in accuracy actually occurred.[11] Without such critical factual support, Blume's declaration, taken as a whole, offers nothing more than unsubstantiated speculation, which is "inappropriate for consideration" on a motion for summary judgment. *Garcia v. Hartford Police Dep't,* 706 F.3d 120, 128 (2d Cir.2013).[12]

---

9. Blume holds Masters Degrees in Ethics and Marine Affairs. *See* Blume Decl. Ex. 1.

10. Similarly immaterial is the fact that defendants have not produced the Vessel's navigation chart, on which a crew member contemporaneously plotted the anchor drop point at 40°35.8N–74°02.6W. Khrypunov Decl. ¶ 17; *see also supra* n. 8. Contrary to plaintiff's conclusory assertion that the chart "does not support defendant's position," Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") 4, the plotted coordinates are south of the drop point indicated by the SVDR data and, thus, further away from the cable field's southernmost boundary, *see* Khrypunov Decl. ¶ 17.

11. Incidentally, we note that it is just as likely that any margin of error worked to defendants' advantage, placing the Vessel even further outside the marked cable field.

12. *See also Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's opinions that are without factual basis and are based on speculation or

We turn, then, to the location where the anchor struck ground. Because the Vessel was traveling south (*i.e.*, away from the cable field) at the time the anchor deployed, Captain Khrypunov maintains that the anchor struck the seafloor outside the cable field. Khrypunov Decl. ¶ 16. In a transparent attempt to create a factual controversy where none exists, plaintiff offers the declaration of Carr to refute this contention. According to Carr, the sonar data indicates that the anchor "dragged" plaintiffs' cable across the southernmost boundary of the marked cable field, *id.* ¶ 5, thus suggesting that the anchor struck the seafloor within the cable field itself. However, Carr's own evidence plainly refutes this contention.

Carr acknowledges that the sonar data shows a " 'scour' mark on the sea bottom, apparently created by the ship's anchor when it dropped to the sea floor." *Id.* 7. In a meticulous choice of words, Carr states that the scour mark exists "within *the vicinity* of the cable area," *id.* (emphasis added)—but not within the cable area itself. Indeed, the diagram attached to Carr's declaration shows the scour mark beginning and ending *outside* the charted cable field, *see id.* Ex. 2 (identifying the anchor "[d]rag" mark),[13] thus precluding the possibility that the anchor "dragged" plaintiff's cable across the cable field's southernmost boundary. These concessions, together with Carr's contradictory conclusions, render the declaration "so replete with inconsistencies" that no reason-able juror would undertake the "suspension of disbelief" necessary to credit Carr's opinion. *Jeffreys v. New York,* 426 F.3d 549, 555 (2d Cir.2005) (internal quotation marks omitted).

We are left, then, with uncontroverted evidence that (i) the Vessel released its port anchor at 10:30:12 a.m., at which time the Vessel's bow was approximately 33 yards outside the charted cable area, *see* Khrypunov Decl. Aff. 12, 14, and (ii) the Vessel's anchor struck ground outside the cable field's southernmost boundary, *see* Carr Decl. ¶ 7, Ex. 2. Based on the foregoing, there can simply be no genuine dispute that the Vessel released its anchor outside of the marked cable field. Nor can there be any dispute that plaintiff's cable, like the anchor that snagged it, was outside the charted cable area, in violation of plaintiff's permit, at the time the allision occurred.[14]

## B. Plaintiff bears the burden of establishing defendants' negligence

In admiralty law, liability for an allision is predicated "upon a finding of fault that caused or contributed to the damage incurred." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 571 F.3d 206, 211 (2d Cir.2009). As in any tort case, the plaintiff generally bears the burden of proving the defendant's negligence. *Id.* (citing *E. River S.S. Corp. v. Transamerica Delaval Inc.,* 476 U.S. 858, 859, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986)).

---

conjecture are ... inappropriate material for consideration on a motion for summary judgment."); *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) ("[A]n expert's report is not a talisman against summary judgment.").

13. In a telephone call with Chambers on March 21, 2013, plaintiff's counsel confirmed that the "[d]rag" notation depicts the location where the sonar data shows the apparent scour mark.

14. As explained *infra,* we need not determine whether a reasonable jury would conclude that plaintiff laid the cable outside the cable field, or, instead, that the cable migrated there after proper installation. *See infra* Section II(C); *see also Sitts v. United States,* 811 F.2d 736, 742 (2d Cir.1987) ("[W]here there is no genuine issue as to the existence of a fact that dispositively entitles the moving party to judgment as a matter of law, all other facts become immaterial.").

However, admiralty law recognizes several burden-shifting presumptions, *see* Thomas J. Schoenbaum, Admiralty and Maritime Law ("Schoenbaum") § 14–3, at 122 (5th ed. 2011), one of which plaintiff invokes here: the *Oregon* rule.

 In *The Oregon*, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895), the Supreme Court held that a moving vessel that strikes a stationary object is presumptively at fault. *See also Zerega*, 571 F.3d at 211. Like any judicial presumption, the *Oregon* rule is "designed to fill a factual vacuum." *In re Mid–South Towing Co.*, 418 F.3d 526, 531 (5th Cir.2005) (internal quotation marks omitted); *see also Zerega*, 571 F.3d at 211 (noting that the *Oregon* rule derives from common sense). Accordingly, the rule has no applicability where "the parties have introduced evidence to dispel the mysteries that gave rise to the presumption." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transp.*, 596 F.3d 357, 362 (6th Cir.2010) (internal quotation marks omitted); *see also* Schoenbaum § 14–3, at 130 (describing admiralty law's presumptions of fault as "relics of an earlier time" when "there were only rudimentary means of gathering evidence and assembling facts").

 The party invoking the *Oregon* rule must prove that the stationary object was "visible," or that the moving vessel possessed "knowledge of the otherwise nonvisible object." *Tex. E. Transmission Corp. v. Tug Captain Dann*, 898 F.Supp. 198, 207 (S.D.N.Y.1995); *see also Am. S.S. Co. v. Hallett Dock Co.*, 862 F.Supp.2d 919,

933–34 (D.Minn.2012) (noting that "[t]he *Oregon* Rule does not generally apply to allisions with hidden, sunken, or submerged objects"); *Great Am. Ins. Co. v. United States*, 552 F.Supp.2d 703, 710 (S.D.Ohio 2008) (stating that the *Oregon* rule "has been invoked 'only against moving vessels which damaged wharves, moored vessels, and other stationary, visible objects.'") (quoting *Delta Transload, Inc. v. Motor Vessel, Navios Commander*, 818 F.2d 445, 450 (5th Cir.1987)).

 Where the *Oregon* rule applies, the moving vessel may rebut the presumption of negligence by showing that (i) "the allision was the fault of the stationary object," (ii) "the moving vessel acted with reasonable care," or (iii) "the allision was an unavoidable accident."[15] *Zerega*, 571 F.3d at 211; *see also Boston v. S.S. Texaco Tex.*, 773 F.2d 1396, 1398 (1st Cir.1985) ("The rule is well settled that when a vessel under its own power collides with an anchored vessel or a navigational structure, the burden of proving absence of fault or *vis major* rests on the pilot vessel."). As relevant here, the first route for rebutting the presumption of negligence is analogous "to the common law tort theory of contributory negligence." *Crowley v. Costa*, No. 09 Civ.1991(JCH), 924 F.Supp.2d 420, 414, 2013 WL 599579, at *8 (D.Conn. Feb. 14, 2013).

 The *Oregon* presumption is clearly inapplicable on the facts of this case. Even assuming, *arguendo*, that (i) there is a factual void to fill[16] and (ii) the Vessel knew (or should have known) that plaintiff's cable existed outside the marked cable field,[17] the evidence establishes that the

---

15. Moreover, even where the *Oregon* rule applies, the burden remains on the party invoking the presumption to prove that the moving vessel's negligence caused the damages alleged. *See Zerega*, 571 F.3d at 212.

16. *But see supra* Section II(A).

17. This is a questionable assumption indeed. To demonstrate that the Vessel's crew pos-

sessed constructive knowledge of plaintiff's otherwise nonvisible cable, plaintiff cites the official Navigation Chart for New York Harbor and the Coast Pilot for New York Harbor. *See* Pl.'s Mem. 11–12. The Navigation Chart for New York Harbor provides that "[a]dditional uncharted submarine pipelines and submarine cables may exist within the area of this chart," *see* Stern Decl. Ex. 1, at Ex. 1,

allision was the sole fault of plaintiff's cable. As previously explained, there is no genuine dispute that plaintiff's cable was positioned outside the cable field at the time the allision occurred. *See supra* Section II(A). Nor is there any dispute that this location was not authorized under plaintiff's permit, *see* Ickes Decl. Ex. 1, or timely reported to NOAA, *see id.* ¶ 13.

On these facts, the *Oregon* rule simply does not apply. *See, e.g., Tex. E. Transmission Corp.,* 898 F.Supp. at 208 (finding the *Oregon* rule inapplicable where plaintiff's pipeline was impermissibly exposed, making it "highly subject to third party damage") (emphasis omitted); *Peoples Natural Gas Co. v. Ashland Oil, Inc.,* 604 F.Supp. 1517, 1522–23 (D.C.Pa.1985) (holding that the *Oregon* rule did not apply when plaintiff's cable "sat exposed on top of the riverbed" in violation of its permit); *cf. United States v. Soriano,* 366 F.2d 699, 709 (C.A.Wash.1966) (noting that the presumption of fault on part of a vessel that runs aground "does not arise until the libellant, who has the ultimate burden of

proof, produces evidence which should lead the court to find that the casualty occurred at a place which should give rise to the presumption"); *Mid–Am. Transp. Co., Inc. v. Nat'l Marine Servs., Inc.,* 497 F.2d 776, 779 (8th Cir.1974) (stating that a grounded vessel is "not presumed to be negligent" if the vessel is inside a navigation channel "and strikes an unknown obstruction"). Accordingly, plaintiff bears the burden of proving defendants' negligence.

### C. Plaintiff cannot carry its burden in establishing defendants' negligence

"The elements to establish a claim of negligence under maritime law are the same as the elements of negligence under common law." *Crowley,* 924 F.Supp. at 414, 2013 WL 599579, at *7 (internal quotation marks omitted); *see also Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC,* 882 F.Supp.2d 496, 529 (S.D.N.Y.2012) (noting that " 'federal maritime law incorporates common law negli-

---

and that mariners should therefore "use extreme caution when operating vessels in depths of water comparable to their draft in areas where pipelines and cables may exist, and when anchoring, dragging or trowling," *id.* The Coast Pilot for New York Harbor similarly "caution[s]" vessels "against anchoring in the vicinity of the pipeline and cable areas as shown on the charts." *Id.* Ex. 5.

Plaintiff has not cited—and this Court has not found—any authority for the proposition that such warnings are sufficient to charge a defendant with constructive knowledge of an otherwise nonvisible object that existed *outside* a charted cable area at the time the allision occurred. On this basis alone, the cases plaintiff cites are wholly inapposite. *See McAllister Towing of Va., Inc. v. United States,* No. 10 Civ. 595, 2012 WL 1438770, at *13 (E.D.Va. Apr. 25, 2012) (finding that a moving vessel was presumed negligent when it dragged debris through a cable area that was "reflected on several NOAA charts"); *Petition of Potomac Sand & Gravel Co.,* 253

F.Supp. 268, 275 (D.C.Md.1966) (determining that a moving vessel was at fault when it allided with a cable that "generally was between the cable crossing signs and, hence, within the cable-crossing area").

In the absence of relevant authority, we would be reluctant to charge the Vessel's crew with constructive knowledge of plaintiff's cable simply because the Navigation Chart and Coast Pilot for New York Harbor warn that uncharted cables may exist within the vicinity of the marked cable field. Determining the "vicinity" at which constructive knowledge is triggered would not only amount to arbitrary rule making, but it would also defeat the purpose of the charts' otherwise clearly-delineated cable and anchorage areas. Moreover, as explained *infra,* it would strike us as both senseless and imprudent to charge the Vessel's crew with constructive knowledge when *actual* knowledge would not contribute toward any. meaningful precaution or loss avoiding behavior. *See infra* Section II(C).

gence principles' ") (quoting *Becker v. Poling Transp. Corp.*, 356 F.3d 381, 388 (2d Cir.2004)). Those elements include (i) duty, (ii) breach of duty, and (iii) injury proximately arising therefrom. *Zerega,* 882 F.Supp.2d at 529.

 Here, defendants owed no duty of care to the nonvisible cable, which sat outside the marked cable field in violation of plaintiff's permit. *See, e.g., Diamond State Tel. Co. v. Atl. Refining Co.*, 205 F.2d 402, 407 (3d Cir.1953) (finding that a tanker owed no duty of care to a cable when the tanker "could not possibly have foreseen that poor navigation would have subjected libellant's cable to an unreasonable risk of harm"); *Tex. E. Transmission Corp.*, 898 F.Supp. at 208 (finding that the scope of reasonably foreseeable risks to a mariner maneuvering in a designated pipeline area did not extend to an allision with "a submerged exposed pipeline above the riverbed, unmarked and unknown, and constituting an unlawful obstruction to navigation"); *Peoples Natural Gas Co.*, 604 F.Supp. at 1527 (holding that a towboat did not owe a duty of care to an exposed pipeline when the captain of the towboat "could not have foreseen" that the pipeline "sat uncovered on the riverbed"); *Abdon Callais Boat Rentals, Inc. v. La. Power & Light Co.*, 555 So.2d 568, 575 (La.Ct.App.1989) (ruling that, even if a vessel "was not properly navigated," it "owed no duty of prudent navigation" to a cable that "sat uncovered on the bottom of [a] bayou in violation of its permit"); *see also The Georgie*, 14 F.2d 98, 99 (9th Cir. 1926) ("[T]he mere dropping of an anchor in public waters in the vicinity of an unknown and unmarked cable does not constitute ... negligence.").[18] Indeed, plaintiff does not claim, let alone substantiate,

that it posted signs notifying passing vessels of the existence of a cable outside the charted cable field, or that it reported the cable's errant location to government agencies.

Instead, plaintiff maintains that the allision was foreseeable in light of navigation charts that warn vessels against anchoring in the "vicinity" of cable areas. *See supra* n. 17. However, even assuming, *arguendo,* that the Vessel was within the "vicinity" of the cable area when it released its port anchor, *but see id.,* we cannot fathom any reasonable precaution, short of deploying divers, that the Vessel could have taken to determine whether it was safe to anchor in an area where it was legally entitled to do so. *Cf. Tex. E. Transmission Corp.*, 898 F.Supp. at 207 (holding that, even if the duty of reasonable care required the defendant to navigate its vessel from the upper pilothouse and/or station lookouts, compliance with this duty "would have been totally ineffective" in avoiding an allision with the plaintiff's submerged pipeline, "which would not have been visible from a vessel at 0250 hours in the morning") (emphasis omitted). In contrast, plaintiff had the ability, the economic incentive, and, indeed, the legal obligation to install and maintain the cable in a manner that prevented its migration outside the designated cable field. *See, e.g.,* Ickes Decl. ¶ 5 (noting that plaintiff's permit required plaintiff to "secure [ ]" the cable "using concrete anchors"). Under these circumstances, there can be little doubt that plaintiff was in the best position to protect against the risk of harm and, thus, liable for any damages arising from the allision.

18. *Cf. The Pierrepont*, 42 F. 687, 687 (D.C.N.Y. 1890) ("If the accident occurred in the regular channel, where no obstruction was known to exist by those engaged in the navigation of the river, the libelants cannot recover; if it occurred outside the regular channel, the steamer was at fault.").

### D. Conclusion

For the foregoing reasons, we find that defendants are entitled to judgment as a matter of law. We have reached that conclusion because of our determination, based on the evidence submitted by plaintiff, that there are no genuine issues of fact with respect to the dispositive issues that (i) the Vessel was outside the marked cable field when it released its port anchor and (ii) the anchor struck ground outside the cable field, as it left a "scour" or (drag) mark beyond the cable field's southernmost boundary. The record is immutable and complete with respect to these facts; further discovery will not recreate the events underlying the anchor drop or enhance the existent evidence in any meaningful way.

By resting our decision on the location of the anchor drop rather than the location where the cable was initially laid, we need not resolve the credibility issues concerning whether plaintiff installed the cable inside the cable field, see Ickes Decl. ¶ 9, Ex. 2,[19] or in an "A to B" line from Brooklyn to Staten Island, see Sherry Dep. 48:18; Singleton Aff. Ex. E.[20]

Having found no genuine dispute with respect to the anchor drop, we reject plaintiff's legal fallback position that defendants are liable because the Vessel was in the "vicinity" of the cable field when it released its port anchor. Not only is such a result inconsonant with relevant case law, but it would also offend a logical resolution of the substantive issue of loss allocation. Plaintiff had the ability, the economic incentive, and the legal duty to (i) install the cable such that it would not migrate outside the marked cable field and/or (ii) monitor the cable to ensure its proper position. Plaintiff's failure to take these reasonable precautions precludes its recovery.

### III. *Sanctions under Rule 11(b) and Section 1927*

Under Rule 11(b), "[b]y presenting to the court a pleading, written motion, or other paper," an attorney certifies "to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,]" that:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so

---

**19.** In its effort to impugn Ickes's credibility, defendants point out that (i) plaintiff produced Ickes's handwritten diagram "after denying several times in open court that any such diagram existed," see Defs.' Reply Mem. of Law in Further Supp. of Their Mot. for Summ. J. 9; (ii) Ickes's handwritten diagram conflicts with similar diagrams he sent to ACE and NOAA, see id.; and (iii) NOAA first received Ickes's correspondence in 2011 (i.e., after plaintiff filed the instant suit), despite the fact that Ickes's cover letter is dated January 2008, see Defs.' R. 56.1 ¶ 16.

**20.** In an effort to attack Sherry's credibility, plaintiff notes that Ickes "purchased real property" from Sherry, and that Sherry subsequently "commenced a lawsuit claiming that OCG has defaulted on the mortgage." See Pl.'s Mem. 7, n. 6. Plaintiff claims that, after his deposition, Sherry contacted Ickes and "bragged" to him that "his testimony made it so it would be impossible for OCG to receive any money in this lawsuit." Id. In other words, plaintiff maintains (counterintuitively, we might add) that Sherry sought to prevent plaintiff from recovering damages in this lawsuit because plaintiff may owe Sherry money vis-à-vis another lawsuit.

identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed.R.Civ.P. 11(b). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for violation." Fed.R.Civ.P. 11(c)(1). However, a court must make any such decision "with restraint and discretion." *Wilson v. Citigroup, N.A.*, 702 F.3d 720, 723 (2d Cir.2012) (internal quotation marks omitted).

■ Section 1927 provides:

Any attorney or other person admitted to conduct cases in any court of the United States ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. To impose sanctions under this provision, a court must find that the challenged claim was (i) "without a colorable basis" and (ii) "brought in bad faith, *i.e.*, motivated by improper purposes such as harassment or delay." *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir.2012) (internal quotation marks omitted). "Although both findings must be supported by a high degree of specificity in the factual findings, bad faith may be inferred only if actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay."

*Id.* (internal quotation marks and citations omitted).

■ In light of the foregoing standards, we do not believe that sanctions are warranted here. To be sure, defendants have raised serious questions of credibility. *See supra* n. 19. Nonetheless, we are required to resolve all doubts in plaintiff's counsel's favor, *Perez v. Posse Comitatus*, 373 F.3d 321, 324 (2d Cir.2004), and, doing so, we cannot conclude that it was objectively unreasonable for counsel to rely on Ickes's representations, as suspect as they may be. Similarly, although we have rejected plaintiff's legal arguments, we are not persuaded that plaintiff has advanced anything beyond a mere losing argument in opposing the instant motion. *Salovaara v. Eckert*, 222 F.3d 19, 34 (2d Cir.2000) ("A distinction must be drawn between a position which is merely losing, and one which is both losing and sanctionable.") (internal quotation marks omitted). We appreciate defendants' frustration with plaintiff's doggedness in pursuing this case. Nonetheless, in an exercise of "restraint," *Wilson*, 702 F.3d at 723 (internal quotation marks omitted), we reluctantly decline to sanction plaintiff's behavior.

### CONCLUSION

For the foregoing reasons, we grant defendants' motion for summary judgment and deny their motion for sanctions. This Memorandum and Order resolves docket entry number 21.